Points Decided.

(November 2, 1911.)

# IDA BLISS, in Her Own Behalf, and as Guardian of NAOMI BLISS, a Minor, Respondents, v. FRIEND J. BLISS and ADELAIDE BLISS, Appellants.

## [119 Pac. 451.]

GIFT—VOLUNTARY TRUST—MANNER OF CREATING—NECESSARY ELEMENTS —LIFE INSURANCE POLICY—BENEFICIARIES AS TRUSTEES UNDER.

### (Syllabus by the court.)

1. A declaration of intention to make a gift unaccompanied by a transfer or delivery of the property is no gift at all and cannot be enforced by the courts.

2. No exact words or terms are necessary to establish a trust, but a voluntary trust cannot be complete unless there is reasonable certainty as to the manner in which the trust fund is to be used or applied, and the purposes of the trust must be plainly indicated.

3. Vague and indefinite expressions, or mere words of recommendation or sentiment, will not be held to create a trust or define its scope. The proof of intention to establish the trust must be unequivocal.

4. Where a son had before his marriage insured his life, naming his father and mother in the insurance policy as beneficiaries, and subsequent to marriage declined to change the beneficiaries in such policy, but expressed to the father the hope and expectation that the father and mother would "take care of his family in case of death and never allow them to want for anything," such words are not sufficient to establish a trust or fix its terms.

5. Courts of equity may declare and enforce a trust, but they have no authority to create a trust or to make a contract for the parties where they did not see fit to make the contract themselves, under circumstances where no trust could be implied or result by operation of law.

APPEAL from the District Court of the Seventh Judicial District for Canyon County.　Hon. Ed. L. Bryan, Judge.

Action by the plaintiff to have a trust declared.　Judgment for plaintiffs and defendants appealed.　*Reversed.*

Henry Z. Johnson, and John T. Morrison, for Appellants.

The evidence required to entitle plaintiff to a decree declaring a resulting trust must be satisfactory, clear and convincing. (*Rice v. Rigley,* 7 Ida. 129, 61 Pac. 290, 20 Morr. Min. Rep. 553; 2 Pom. Eq. Jur., 1st ed., sec. 1040; 10 Am. & Eng. Ency. of Law, 1st ed., 29; *Pitts v. Weakley,* 155 Mo. 109, 55 S. W. 1055.)

"In the creation of a trust in personalty, the language employed must be definite and positive. . . . . The declaration of a purpose to create a trust is of no value, and a promise to make a donation at some future time, where there is no consideration, at best, is only an imperfect gift and will not be upheld as a trust." (1 Beach on Trusts and Trustees, sec. 52; *Skeen v. Marriott,* 22 Utah, 73, 61 Pac. 296.)

"The courts will not interpose to perfect an inadequate or incomplete creation of a trust." (1 Beach on Trusts and Trustees, sec. 41; *Estate of Webb,* 49 Cal. 541; 2 Pom. Eq. Jur., 1st ed., pp. 548, 549.)

The court erred in permitting the plaintiff, Ida Bliss, to testify to conversations she overheard between the deceased and third parties respecting his, the deceased, purpose in carrying insurance. (*Austin v. Wilcoxson,* 149 Cal. 24, 84 Pac. 417, 418.) Also in admitting her testimony that Bliss told her that the deceased said he would not change it, he would leave it, the insurance money "on trust with them [the defendants] for us." Such evidence was clearly incompetent and inadmissible, and would be entitled to little or no consideration even if it were otherwise legal evidence. (*Pitts v. Weakley, supra.*)

A voluntary executory agreement to create a trust *in futuro* cannot be enforced in equity. (*Estate of Webb,* 49 Cal. 541; *Allen v. Witherow,* 110 U. S. 119, 3 Sup. Ct. 517, 28 L. ed. 90; *Martin v. Funk,* 75 N. Y. 134, 31 Am. Rep. 446; *Young v. Young,* 80 N. Y. 422, 36 Am. Rep. 634; *Milroy v. Lord,* 4 De Gex, F. & J. 264; *Estate of Smith,* 144 Pa. 428, 27 Am. St. 641, 22 Atl. 916; *Williamson v. Yeager,* 91 Ky. 282, 34 Am. St. 184, 15 S. W. 660.)

Evidence to establish a trust must be clear, distinct, convincing and uncontradictory, and especially so when it is proposed to establish it by parol. (*Snider v. Johnson,* 25 Or. 328, 35 Pac. 846; *Allen v. Witherow,* 110 U. S. 119, 3 Sup. Ct. 517, 28 L. ed. 90; *De Roboam v. Schmidtlin,* 50 Or. 388, 92 Pac. 1082; *Skeen v. Marriott,* 22 Utah, 73, 61 Pac. 296; 1 Perry on Trusts, 5th ed., sec. 86, citing cases.)

Hawley, Puckett & Hawley, for Respondents.

"No particular form of words is necessary to create a trust." (*Gerrish v. New Bedford Inst.,* 128 Mass. 159, 35 Am. Rep. 370; 5 Ency. of Law, 2007; *Robb v. Washington etc. College,* 103 App. Div. 327, 93 N. Y. Supp. 92; *Hirsh v. Auer,* 146 N. Y. 13, 40 N. E. 397.)

A life insurance policy's proceeds may be made the subject of a trust. (*Silvey v. Hodgdon,* 52 Cal. 363; *Austin v. Wilcoxson,* 149 Cal. 24, 84 Pac. 417; *Roach v. Caraffa,* 85 Cal. 436, 25 Pac. 22; *Woodruff v. Tillman,* 112 Mich. 188, 70 N. W. 420; *Hurd v. Doty,* 86 Wis. 1, 56 N. W. 371, 21 L. R. A. 746; *Cowin v. Hurst,* 124 Mich. 545, 83 Am. St. 344, 83 N. W. 274; *Bancroft v. Russell,* 157 Mass. 47, 31 N. E. 710; *Kendrick v. Ray,* 173 Mass. 305, 73 Am. St. 289, 53 N. E. 823.)

Anything which is relevant to show the intention of the donor of the trust is admissible, including his statement. (*Gerrish v. New Bedford Inst., supra; Clark v. Callahan,* 105 Md. 600, 66 Atl. 618, 12 Ann. Cas. 162, 10 L. R. A., N. S., 616, and annotations.)

It is not essential for the creation of a valid trust that the trustee either know of or consent to the trust. (25 Ency. of Law, 896; *Swenson v. Swenson,* 17 S. D. 558, 97 N. W. 845; *Koche v. Streuter,* 232 Ill. 594, 83 N. E. 1072; *Wells v. German Ins. Co.,* 128 Iowa, 649, 105 N. W. 123.)

The existence of a complete trust is in every case to be determined as a question of fact, having in view the surrounding facts and circumstances of the transaction, the intention of the parties, and the substance rather than the form of the instrument.

It is a question largely for the court to decide whether or not the evidence must be clear, satisfactory and convincing. (*Austin v. Wilcoxson,* 149 Cal. 24, 84 Pac. 417; *Noble v. Learned,* 153 Cal. 245. 94 Pac. 1047; *Bollinger v. Bollinger,* 154 Cal. 695, 99 Pac. 196; *Freese v. Hibernian Savings etc. Society,* 139 Cal. 394, 73 Pac. 172.)

AILSHIE, J.—This action was instituted praying a judgment and decree declaring Friend J. Bliss and Adelaide Bliss trustees of the proceeds of a certain life insurance policy for the use and benefit of the plaintiffs, Ida Bliss and Naomi Bliss, a minor. Ida Bliss is the surviving widow of one Ezra Ray Bliss, now deceased, and Naomi Bliss is the daughter and minor child of Ida Bliss and Ezra Ray Bliss. The appellants, Friend J. Bliss and Adelaide Bliss, are the father and mother of Ezra Ray Bliss, deceased. On the 23d day of June, 1904, Ezra Ray Bliss, being then unmarried, took out a life insurance policy in the Bankers' Reserve Life Co. of Omaha, Neb., for $5,000, and caused his father and mother, the appellants herein, to be named as the beneficiaries under that policy. Thereafter and on the first day of January, 1907, Ezra Ray Bliss was married to the respondent, Ida Bliss. Thereafter and on the first day of November, 1907, there was born to respondent, Ida Bliss, and Ezra Ray Bliss, a daughter, Naomi Bliss, who is the other respondent in this case. The policy of insurance was deposited by Ezra Ray Bliss with the First National Bank of Emmett for safekeeping, and it remained in the custody of the bank from that time until after the death of the insured, which occurred on the 3d day of February, 1908. The policy was thereafter delivered to the appellants herein and was by them collected from the insurance company. This suit was subsequently instituted by the wife of the deceased and the infant daughter to have the beneficiaries named in the policy declared to be trustees for the use and benefit of the wife and daughter of the deceased. The trial resulted in a judgment in favor of the plaintiffs, and the defendants prosecuted this appeal.

The question to be determined on this appeal is: Was there sufficient evidence to justify the trial court in decreeing and declaring a trust in this case, and does the evidence show that the beneficiaries named in the policy were ever constituted trustees, or did they take the absolute title to the benefits under the policy? The evidence in the case is entirely oral. No evidence of any trust was ever reduced to writing. The oral testimony furnished is exceedingly meager and desultory. It all revolves about and refers back to a conversation which took place between Ray, the insured, and his father, one of the beneficiaries, shortly subsequent to the birth of respondent's child, Naomi. Ida Bliss testified that after the death of her husband her father in law told her that a short time after the birth of Naomi, when he and Ray were out duck hunting, that he approached his son on the subject of changing the beneficiaries in his insurance policy. She testifies that her father in law repeated the conversation to her as follows:

" 'While Ray and I were out duck hunting one time,'—I believe it was in October or November, I am not sure which, probably September, 1907, 'I insisted on Ray changing the policy since he had a wife now'—and I believe it was after the baby was born. He said, 'You have a wife and family now; you should change your policy; you can't tell what is going to happen to you.' And Ray said, 'No, father, I am perfectly satisfied the way it is; I intend to leave it that way.' He insisted on his changing it, but Ray said he knew—in his exact words, 'I know you and mother will take care of my family in case of my death, and never allow them to want for anything, and you know that would be my wish.' "

The appellant, Friend J. Bliss, relates the conversation and transaction as follows: "At the time of my son's death, I did not know who was named as beneficiary in the policy. The only time I ever saw the policy was when it was first made out. I knew it was made out in the first place to Mrs. Bliss and myself, but I had no further knowledge of the matter. About the 13th of November, 1907, I was going over some papers with my son and I found a policy of his in the

Commercial Travelers of Chicago. It was the first I knew of this policy. I looked it over and noticed that he had made his mother the beneficiary. I said, 'Ray, now you have a wife and child, don't you think you had better change this and make it to your wife and child?' He said, 'No, papa, I want it to stand just as it is.' He spoke so sharply and quickly that I had no further conversation with him at all. That is the only conversation I had with him at any time with reference to the beneficiary in any policy." It will be observed that the foregoing has reference to a different policy from that in controversy in this action. This constitutes the entire transaction out of which it is claimed a trust arises.

The respondent, Ida Bliss, testified to hearing a number of conversations which took place between her husband, who was an insurance agent, and other persons with reference to his own insurance. This evidence was introduced for the purpose of showing that Ray Bliss thought his insurance was in such condition and status that in case of his death it would inure to the benefit of his wife and child. The following is a fair sample of this line of evidence: Ida Bliss testified to a conversation which took place between her husband and a Mr. Dewey as follows: "Mr. Bliss told Mr. Dewey he should have an insurance, if he did not have already, to protect his wife in case he died, the same as he was protecting his own wife. I am not sure whether Mr. Dewey had a wife or not. He was living at Pocatello at that time. . . . . That is the only conversation I heard between my husband and Mr. Dewey. Mr. Dewey was working for my husband with headquarters at Pocatello, and was under the direction of my husband. My husband was manager of the company. This conversation was at our home in Pocatello. Mr. Dewey was frequently there. This was the only time I heard any conversation between my husband and Mr. Dewey relative to insurance." Other conversations with different persons concerning which she testified were of the same general character and equally as vague and indefinite. Prominent among

the list is a man named Marquis of Portland, Oregon, whose deposition appears in the record.

The only further evidence in the case on behalf of the plaintiffs was concerning the acts and declarations of the appellants subsequent to the death of their son. There is naturally a conflict between the parties as to just what was said at these various conversations. This perhaps grows out of the usual and well-known difference of construction placed by different parties upon the language used and different degrees of accuracy and memory. There is no dispute but that many conversations took place between them. Ida Bliss testifies to several had with the appellant, Friend J. Bliss, and perhaps an equal number with the appellant Adelaide Bliss, subsequent to the death of her husband, in which they assured her that they were going to take care of her and that she need have no worry over financial matters. For instance, she says at one time that Mr. Bliss said to her, "Ida, you don't need to worry about your financial condition. You are well provided for. Ray has left you well provided for, and you will not want for anything as long as I live." After the policies were collected, she says she had a talk with her father in law, Mr. Bliss, and wanted an agreement or understanding with him and asked him to give her a written agreement, and he declined to do so. He then said, "I will tell you what I will do. I will pay you $1,000 a year, $500 every six months; and he asked me if I was satisfied with that and I told him I was." It seems that in pursuance of this understanding, he paid bills and accounts for her and furnished her cash to the amount of about $574. She also testifies that Mrs. Adelaide Bliss gave her like assurance as had been given her by the father in law, and she says that on several occasions Mrs. Bliss told her that she and her husband never expected to use a cent of Ray's insurance, but that they would use it for the benefit of their son's wife and daughter. She says that she did not know how the policies were made out until after her husband's death.

It is clear from the evidence of both the appellant and respondent that the main consideration which was moving and

prompting the father in law and mother in law, the appellants herein, was to have the daughter in law take up her residence with them. It is conceded that they were deeply interested in the baby. They were at the time building a new home which they named "Naomi," after the granddaughter. Ray Bliss was their only child and they seemed to have been deeply affected over his loss. At every conversation which they had concerning which any testimony has been given, it seems that the question arose about Ida coming and bringing the baby and living with Mr. and Mrs. Bliss. They prepared rooms in their new home for her. It also appears that Ida Bliss was an only child, the daughter of one John Cook. Cook was a man in very good circumstances, worth about $75,000, as appears from the record. He was set down by all parties who ventured an opinion as a miser, and this was the estimate the son in law Ray placed upon him. Cook and Ray Bliss were not on good terms, and Ray appears to have cordially disliked the old man. The inference is pretty strong from this record that as soon as this insurance question came up after the death of Ray Bliss, Cook began to take a hand in the matter and urged his daughter to insist on getting hold of the insurance money. The differences and misunderstandings began to grow and were magnified from that time on. Ida refused to go and take up her residence, even for a part of the time, with the appellants. They in turn insisted on her coming and keeping the baby with them, at least a part of the time, and asked that they be permitted to provide for it and look after its education. During this time the old man Bliss was making inquiry and investigation as to where he could invest this insurance money in a permanent security such as bonds, or bank stock, that would pay a fair rate of interest or income. In the meanwhile, this action was commenced to have the beneficiaries named in the policies declared trustees and to have them removed and the money paid over to the *cestuis que trust*. It should be borne in mind that there is no evidence in the record and no contention is made that any conversation ever took place between Ray Bliss, the insured, and Adelaide Bliss, one of the bene-

ficiaries named in the policy, with reference to the insurance or the disposition of any money that might ever be received under the policy, or anything of that kind. All the conversations which it is claimed ever took place prior to the death of the insured were between Ray Bliss, the insured, and Friend J. Bliss, his father, who is named as one of the beneficiaries.

Under the laws of this state, sec. 2676, Rev. Codes, if no trusteeship be established, one-half the receipts of this policy would become the separate property of the wife, Adelaide Bliss, and under the provisions of sec. 2677, Rev. Codes, she would have the management and control of her share of the proceeds from this policy, and would have the absolute power and right of disposition of the same. One-half would, therefore, go to her absolutely, and in order to impress that half with a trust the same proof is necessary as to Adelaide Bliss as is necessary with reference to Friend J. Bliss.

This action has been prosecuted on the theory that the trust was established and created by the declarations of the insured made to the beneficiary Friend J. Bliss, during the lifetime of the insured. It is only upon this theory that a recovery is sought or could be had. If, indeed, it were attempted to establish the trust by reason of the acts and declarations of the beneficiary or beneficiaries after the collection of the fund, the case would shift entirely from one of trust to one of gift, and we would then be confronted with the controlling question in such cases that a declaration of intention to make a gift, unaccompanied with a transfer or delivery of the property, is no gift at all, and cannot be enforced by the courts. It is merely the declaration of an intention, unaccompanied by the acts necessary to execute such intention. If a trust is to be established in this fund, it is necessarily an express trust declared by the insured or settlor and accepted and concurred in by the trustee, who is the beneficiary named in the insurance policy. This action has been prosecuted on that theory, and if maintainable at all, must be maintained upon that principle. Indeed, there is no element in this case of a trust arising by operation of law.

Now, we may safely proceed to the further consideration of this question upon the theory which we think is well established, that no exact words or terms are necessary to establish a trust. It is well settled, however, that no trust can arise or be implied ''if there is uncertainty as to the property to be subjected to the trust or to the persons to be benefited by the trust, or as to the manner in which the property is to be applied.'' (1 Perry on Trusts, sec. 116.)

In *Young v. Young*, 80 N. Y. 437, 36 Am. Rep. 634, the court said: ''A voluntary trust must be created by the donor, and not by the court.'' And again, in the same case, the court said: ''Three things, it has been said, must concur to raise a trust: 'Sufficient words to create it, a definite subject, and a definite object,' and to these requisites may be added another, namely, that the terms of the trust should be sufficiently declared.'' (See *Pitts v. Weakley*, 155 Mo. 109, 55 S. W. 1062.) A voluntary trust could not be complete unless there be certainty as to the property to be subjected to the trust, nor would it be complete unless there be certainty as to the *cestuis que trust*, nor would it be complete unless there be certainty as to the terms of the trust, or, in other words, as to the use to which the trust fund is to be applied and the manner in which it is to be used. A somewhat different rule applies with reference to implied and resulting trusts (1 Perry on Trusts, sec. 112), but with that subject we are not called upon to deal at this time.

Beach on Trusts and Trustees, sec. 52, says: ''In the creation of a trust in personalty, as well as in real estate, the language employed must be definite and positive. The property which is the subject matter of the trust must be clearly and definitely described; the purposes of the trust must be plainly indicated, and as well the person or persons who are to be beneficiaries. Ambiguous or vague and indefinite expressions will not be held to create a trust. In addition to this, the proof of the trust must be unequivocal. The declaration of a purpose to create a trust is of no value, and a promise to make a donation at some future time, where there is no con-

sideration, at best is only an imperfect gift, and will not be upheld as a trust.''

In the light of the foregoing general principles applicable to cases of this kind, we turn to the evidence in this case to see if it is reasonably certain and definite on the principal requisites to a valid trust. In the first place, if the language used or the transaction which took place can be held or construed to look to a trust, it is reasonably certain as to the property to be administered, namely, the receipts from the insurance policy. It is likewise equally certain as to the beneficiaries of that trust, namely, Ida Bliss and her daughter, Naomi Bliss. As to the terms and conditions of the trust, however, it is by no means certain. It is conceded by all parties that it was not intended by Ray Bliss that this fund should be paid over to or handled by his wife, Ida Bliss. She was considered by all parties on account of her youth and inexperience to be an unfit person to have the handling of any considerable sum of money. It is therefore clear that the husband never intended that the money should be paid over to his wife. It is also evident that he feared if it should be paid to her that his father in law, Cook, would get hold of the money, and that was a very important consideration with him. There is no attempt to show, however, that if this money was to be used for the benefit of the wife and daughter, whether the principal was to be kept continually intact and the interest and income only used for their benefit, or whether the principal itself was to be used from time to time, and if so to what extent and in what amount.

Counsel for respondent when they commenced this action realized the necessity of definiteness and certainty as to the terms of the trust, and they therefore alleged that the money received should be ''held in trust by the defendants for investment by them, and the income and proceeds of said investment provided and paid for the support and maintenance of the plaintiffs herein.'' In other words, the action has been prosecuted on the theory that a trust was established whereby the beneficiaries named in the policy were to collect the money and invest it and use the income and receipts therefrom for

the maintenance and benefit of the respondents. No evidence whatever was introduced to support this, except proof that the appellant Friend J. Bliss stated on different occasions after he collected the money from the insurance company that he intended to invest it in stocks or bonds or some safe security and use the interest for the maintenance and support of the wife and daughter of his deceased son. There is nothing, however, to show or indicate that this was a part of any trust agreement or that the son in his lifetime ever mentioned such terms or conditions or indicated any such wish or desire. Again, if this were true, there is an utter lack of even suggestions or indications as to what should eventually become of the principal sum, whether that sum should eventually be divided between the *cestuis que trust* or become the absolute property of the trustees, or be used in the judgment and discretion of the trustees as they might think best.

The court in this case did the very thing that it is absolutely certain from the record herein that the insured never intended to happen, and that is, it ordered all this money paid over to Ida Bliss, the wife of the insured. This would result in accomplishing the very thing that the insured intended should never happen, that is, render it possible for this money to find its way into the hands of John Cook, the father in law. So we see upon the very threshold of our investigation that this so-called trust is wholly lacking as to *the terms and manner of use and disposition of the fund.* It might, however, be within the power of a court of equity to direct, as the trial court did in this case, that the whole fund be turned over to the *cestuis que trust* if it were clear and unmistakable from the evidence in the case that the trustor or settlor positively intended that the entire fund should be so paid over or disposed of. It is in evidence by all parties that when the father mentioned the matter to his son of changing the beneficiaries in the policy, that the son declined to do so and said, ''I want it to stand just as it is.'' Now, it is clear from the evidence, and no one disputes it and no circumstance refutes it, that if the son intended that the wish he expressed to his father should be *imperative and mandatory* and con-

stitute him a trustee, *he never completed or perfected the trust in that he never gave any directions as to the manner or method of use, payment, or disposition of the trust fund.*

It has proven to be one of the most difficult problems which has confronted courts of equity to determine just when expressions of wish, hope, recommendation, or request used by a donor or trustor should be construed as imperative and obligatory or as mere suggestions to be acted upon according to the discretion of the party to whom they are directed. Such expressions have produced a fertile field of litigation in the courts of chancery of both England and this country. (*Knight v. Knight,* 3 Beav. 148; Perry on Trusts, secs. 113 and 114.)

In *Knight v. Knight, supra,* Lord Langdale said: "It is not every wish or expectation which a testator may express, nor every act that he may wish his successors to do, that can or ought to be executed and enforced as a trust; and in the infinite variety of expressions employed and of cases which arise, there is often the greatest difficulty in determining whether the act desired or recommended is an act which the testator intended to be executed as a trust."

In *Barrett v. Marsh,* 126 Mass. 213, Justice Ames, speaking for the court in considering whether a testator had by his will imposed a trust, said: "It is not every expression of a wish in the interpretation of a will that is to be construed as a command, or as the creation of a trust. In order to have such an effect, it must appear that the words used were intended by the testator to be imperative."

In *Hess v. Singler,* 114 Mass. 56, the court, in considering this question, announced the following general principle as applicable in such cases: "In order," said the court, "to create a trust, it must appear that the words were intended by the testator to be imperative; and when property is given absolutely and without restriction, a trust is not to be lightly imposed, upon mere words of recommendation and confidence." The foregoing rule was quoted with approval and followed in *Sears v. Cunningham,* 122 Mass. 538.

In *Cheston v. Cheston,* 89 Md. 465, 43 Atl. 768, the testator inserted in his will the following residuary clause: "All the rest and residue of my property, real, personal, and mixed, I give, bequeath and devise to my dear wife, Sallie C. Cheston, believing that she will manage it judiciously, and perfectly satisfied that she will make a fair distribution of it among our children at her death." It was claimed by the children that the foregoing declaration constituted the wife a trustee of the residuary estate for the use and benefit of the children as *cestuis que trust.* .The court in disposing of the question said: "The testator in so many words devises his estate to her absolutely—and then explains that he does so because he believes she will manage it judiciously and distribute it fairly. In other words, his motive for giving the estate absolutely to his wife, without making any provision for their children, is his conviction, his belief, that she will provide for them judiciously and fairly. It is as though the testator had said: 'Believing that my wife will make a just and fair distribution of my estate, I devise the same to her.'

"The words which, it has been suggested, may possibly create a trust in favor of Mrs. Cheston's children, are not precatory in their character, and therefore the doctrine of precatory trusts cannot be properly applied to them. The testator makes no *recommendation* and expresses *no wish* as to the final disposition of his residuary estate to be made by the residuary devisee. He leaves that absolutely to her, because he has entire confidence in her discretion, and believes she will do what is fair and just. If this be the fair construction of the clause under consideration, we think it unnecessary to discuss the application of the doctrine of precatory trusts to the language here used."

The foregoing case is in many respects very similar to the one under consideration. Here no change of property or position took place. No change in the policy was made in any respect. The policy already named the father and mother of the insured as beneficiaries. The policy was not at the time in the possession of either the insured or the beneficiaries, but was on deposit in the bank apparently available upon demand

of either the insured or the beneficiaries. The subject of the change of beneficiaries was not mentioned by the insured, and it seems clear from the evidence that he never would have mentioned it as he did not desire any change. The discussion was brought about by the father. The insured was not prevented or delayed from making a change in the beneficiary by reason of any promise made by the beneficiary previously named. *No transfer of any property or right of any expectancy was then made. The only estate then existing which could then be the subject of a trust or trust agreement was a mere expectancy in the benefits of a life insurance policy.* It was not then tangible property but only an expectancy dependent upon the demise of the insured prior to that of the beneficiary. According to the evidence, the insured then informed his father, ''I intend to leave it that way''; that is, the way it then existed, naming the father and mother as beneficiaries. Then he added, ''I know you and mother will take care of my family in case of my death and never allow them to want for anything, and you know that would be my wish.'' This seems to indicate that the son wanted the policy paid to the father and mother and that he was willing to rely wholly upon their discretion and sense of the needs of the wife and child in the event of the son's death. That was a hope and expectation that the father and mother would ''take care of his family in case of death and never allow them to want for anything.'' It might have required, so far as they could then anticipate or foresee, a great deal more than the proceeds from the insurance policy to accomplish that end, or it might have required little or none of it whatever. It was merely the expression of a sentiment and confidence which any son might well entertain concerning his parents, and the treatment and relation he would expect them to sustain toward his own wife and child in the event of his demise. This sentiment and confidence might equally as well have been expressed had there been no insurance involved in the conversation or had there been no property belonging to the son or over which he had control or dominion referred to in such conversation.

A case very similar and very much in point is that of *Pitts v. Weakley,* 155 Mo. 109, 55 S. W. 1055. There the plaintiffs sought to establish a trust in stock of a corporation formed to administer their father's property. The father, in anticipation of early demise, had caused certain stock to be delivered to the plaintiff's sister, and the only evidence as to the terms and conditions of the delivery was an alleged statement made by the sister to whom the stock was delivered that the father when handing her the stock had told her to keep it, as it was all he had on earth, and statements made by her subsequent to the death of the father as to the terms of the delivery and the fact that she was to hold it for herself and certain of the plaintiffs. The supreme court of Missouri considered the case in detail and reviewed the evidence and the authorities bearing on the subject at great length. In discussing the character of evidence introduced in the case and upon which it was necessary to predicate a trust, the court said:

"The plaintiff's testimony tending to establish the trust consists entirely of the statements of witnesses as to admissions that Mrs. Weakley is said to have made. Even in ordinary lawsuits, that is not a high grade of evidence. Every text-writer on the subject treats it rather with toleration than favor. Greenleaf says: 'With respect to all verbal admissions, it may be observed they ought to be received with great caution. The evidence, consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake.' (Greenl. Ev., sec. 200.) A note to that section by Judge Redfield is: 'In a somewhat extended experience of jury trials, we have been compelled to the conclusion that the most unreliable of all evidence is that of the oral admissions of the party, and especially where they purport to have been made during the pendency of the action, or after the parties were in a state of controversy.' 'With respect to verbal admissions it may be observed they ought to be received with a great deal of caution.' (1 Phil. Ev. 479.)"

And in finally reaching a conclusion, the court said: "It is only upon such vague, equivocal, and shadowy testimony

that the plaintiffs ask the court to establish a trust, name its beneficiaries, and define its limits. We would have to overthrow all precedents, and disregard all rules of evidence, to do so. This we could not do, even if there was an apparent hardship in the case demanding it; but there is none such."

The foregoing is applicable to the evidence produced in the case at bar. Here the entire case rests upon the oral statements and admissions of the parties, and those were made at times and under circumstances when they could, out of the very nature of the case, have had but little bearing upon the specific subject of a trust here under litigation. The insured was an insurance agent and it would be only natural that he should have made the statements with reference to his own insurance where he was seeking to write insurance for others. Besides, there is nothing inconsistent between the statements he is claimed to have made and the fact of his policies running in favor of his father and mother. On the other hand, the statements attributed to the appellants herein were only natural, and might have been expected from parents in comfortable circumstances, even though there was no insurance involved and they did not anticipate receiving anything under an insurance policy. If they were financially able, as they were, they would naturally expect to contribute toward the support of their daughter in law and the education of their granddaughter. Viewing the matter from another standpoint, it is not at all improbable that the son thought it best to carry this insurance in favor of his father and mother, for the reason that his wife, Ida Bliss, was an only child of wealthy parents, and he may have thought that in the event of his death, the father in law was amply able to take care of his wife and daughter and would do so; and if anything further should be needed, his own father and mother would contribute as the exigencies of the occasion might demand. The fact that he was an insurance agent renders it quite conclusive that he knew the rules and regulations of the company with reference to the change of beneficiary, and that had he intended to change the beneficiary either absolutely or convert the old beneficiaries into trustees, he would have

done so in the manner pointed out by the rules and regulations of his company. The insured had ample opportunity to make any change he desired to make with reference to the beneficiaries and to impose any trust or restrictions he saw fit. It appears conclusively, however, that he did not desire to make any change or alteration, and judging from the evidence as given by both sides, he never would have made any mention of the matter had not his father called it to his attention. Had nothing whatever been said about it and had no conversation taken place, it is clear there would have been no trust relations existing and no court would have assumed to declare a trust under such circumstances. In our opinion, it would be just as easy and just as consistent with well-established rules of equity to have declared a trust had none of the conversations enumerated in the record taken place as it would be for us to undertake to do so as the record stands in this case. Courts of equity may *declare and enforce a trust,* but they have no authority whatever *to create a trust or to make a contract* for the parties where they did not see fit to make the contract themselves; nor can we impose a restriction which the parties themselves did not see fit to place upon the transaction.

We have considered it immaterial for the purposes of this case to discuss the question as to whether or not the beneficiaries had acquired such an interest under the policy as to render it necessary to have their consent before a new beneficiary could be named. The view we have taken of the case renders that discussion entirely useless.

Counsel for respondent have cited us to several cases where courts have held the beneficiaries to be trustees under the expressed wish of the insured for the benefit of third parties. Among those cases the following are the leading and most prominent to which our attention has been called: *Kendrick v. Ray,* 173 Mass. 305, 73 Am. St. 289, 53 N. E. 823; *Clark v. Callahan,* 105 Md. 600, 10 L. R. A., N. S., 616, 66 Atl. 618, 12 Ann. Cas. 162; *Hirsh v. Auer,* 146 N. Y. 13, 40 N. E. 397, affirming 29 N. Y. Supp. 917; *Hurd v. Doty,* 86 Wis. 1, 56 N. W. 371, 21 L. R. A. 746; *Silvey v. Hodgdon,* 52 Cal. 363. No

one of these cases is parallel with the case under considera-
tion. We will briefly point out the dissimilarity.

In *Kendrick v. Ray,* the policy was made out, in the first
place, to E. A. Taft, trustee. Neither the nature nor char-
acter of the trust nor the name of the *cestui que trust* ap-
peared on the face of the policy. During the lifetime of the
insured, however, he declared to the intended *cestui que trust*
the purpose of the trust, and upon his death left written di-
rections with his will as to the terms of the trust and the name
of the *cestui que trust,* so there was nothing left to be deter-
mined or ascertained by the court with reference to the nature
or character of the trust, and the only duty of the court was
simply to declare the trust and order it executed.

In *Clark v. Callahan* the certificates were transferred on
specific conditions and it was shown to the satisfaction of the
court in that case that the transferee, Mrs. Callahan, ac-
cepted the substitution of her own name and undertook to
carry out the trust, and that this understanding was the mov-
ing consideration for Colonel Raphun (the insured) naming
the trust beneficiary and making the substitution.

In *Hirsh v. Auer,* at the time the policy was issued and
Clara Auer was named as the beneficiary, it was agreed and
understood between her and the insured that she should col-
lect the policy upon the death of the insured and expend not
to exceed $500 thereof in paying the insured's funeral ex-
penses and for a monument, and to divide the remaining
$1,500 equally between insured's two minor children.

In *Hurd v. Doty,* the real question which was considered
and passed upon by the court is stated as follows in the
syllabus:

"Where one, after procuring insurance on her life, payable
to plaintiff, had the policy changed so as to make it payable
to defendant, the latter agreeing to receive the proceeds in
trust for plaintiff, who accordingly delivered up for cancella-
tion the former insurance certificate, which had been delivered
to him, defendant cannot, after receiving the proceeds, refuse
to pay it over to plaintiff on the ground that the latter had
no insurable interest in the life of deceased."

In *Silvey v. Hodgdon,* 52 Cal. 363, an agreement was had between the insured and the beneficiary named in the policy prior to the issuance of the policy, that the beneficiary should be named therein solely as a trustee without any beneficial interest to accrue under the policy, and that she would collect the policy for the use and benefit of the children of the insured.

In the foregoing and other cases cited by respondent where a beneficiary has been held as trustee for the benefit of a third party, there was some specific understanding between the insured and the beneficiary or some act was done in pursuance of an express or implied trust. In most of the cases, either the policy was taken out on the faith of that understanding or the name of the beneficiary was changed and a new beneficiary substituted in pursuance of such faith and under such understanding and agreement. In every one of the cases some positive act was done or performed or the insured made some change in his position in the belief that the trustee would carry out this wish and execute such wish and desire as an imperative trust.

In the present case, the insurance had been taken out some years before the insured had either a wife or child, and the parents had been named as beneficiaries. In our opinion, the insured never thought of creating a trust or naming his parents as trustees, but rather preferred to rely on their sentiments of love and affection and the ties of consanguinity for the care, protection and maintenance by his parents of the wife and babe in event of misfortune overtaking him. Although his parents strenuously resist this action, it does not appear from this record that these old people will prove recreant to the filial faith and confidence thus reposed, or that they mean to abandon this mother and child or give them no aid or assistance. It is to be sincerely hoped that in the contest between the parents of Ray and Ida Bliss over the right to handle and expend this insurance money, the comfort and welfare of the widow and child may not be entirely ignored or disregarded. The old people, both Bliss and Cook, apparently have abundance and to spare, and both

families have only this widowed daughter and grandchild on whom to bestow their care and patrimony, and it occurs to us that if they would do less quarreling and give a little more attention to the needs of those to whom they owe a paternal duty they would get along much better.

We have been wholly unable to find any evidence in the record which would justify us in affirming the judgment in this case, unless we ignore the most fundamental rules of equity and create and define a trust for the parties which the trustor or donor declined to do himself in his lifetime.

Another thing must not be lost sight of in this case. This suit involves the benefits under an insurance contract which is one of the most sacred contracts that can be made. Such a contract is entered into by the insured in cool deliberation, and not ordinarily under stress of business exigencies or importunities of creditors or business associations. The insured names his beneficiary (a right wholly his own) for reasons wholly his own and which he is never to be called upon to explain or divulge to anyone else unless he sees fit voluntarily to disclose them. The beneficiary nominated in the policy is of the insured's own naming, and that beneficiary should never be changed or converted into a trustee for anyone else except on clear and convincing proofs. An insurance policy and the benefits thereunder is the property of the beneficiary, and the estate of the insured has no interest whatever therein.

The judgment must be reversed, and it is so ordered, and this case is remanded for further proceedings in accordance with this opinion. Costs awarded to appellants.

Stewart, C. J., concurs.

SULLIVAN, J., Dissenting.—I am unable to agree with the majority of the court either upon the law or the facts as stated and given in the majority opinion. This action was brought upon the theory that Ezra Ray Bliss, deceased, intended that the proceeds of these life insurance policies should go to the use and benefit of his wife and child. It appears

that on the 23d day of June, 1904, Ezra Ray Bliss, being then unmarried, took out a life insurance policy in the Bankers' Reserve Life Company of Omaha, Nebraska, for $5,000, and named his father and mother beneficiaries in said policy, and it is the proceeds of that policy that is involved in this case. It also appears that Ezra Ray Bliss took out an accident insurance policy in the Illinois Commercial Travelers' Association of Chicago, for $5,000, and his mother was named the beneficiary therein. Said policies were taken out prior to his marriage with Ida May Bliss, one of the plaintiffs herein, which marriage occurred on the first day of January, 1907. On the first day of November, 1907, a female child was born to said deceased and the plaintiff, Ida May Bliss. It clearly appears from the evidence that Ezra Ray Bliss thought his wife was incapable of making investments wisely of the proceeds of said policies, and he therefore desired them to be in the hands of parties trusted by himself, and those parties were his father and mother. Said policies were not delivered to the father and mother but were deposited in the bank at Emmett and delivered to them after his death.

On February 2, 1908, at American Falls, Idaho, Ezra Ray Bliss accidentally received a gunshot wound, of which he died a few hours thereafter. He left no estate except a homestead and certain personal property not to exceed the value of $1,400.

On the trial certain issues were submitted to the jury and upon those the jury in substance found that Ezra Ray Bliss did not part with the control of said policy of insurance prior to the time of his death, and that it was the clear intention and desire of said Ezra Ray Bliss that his wife and child should receive the benefits to be derived from said insurance policy, and that the defendants, who are appellants here, admitted that they held the proceeds of said policy of insurance for the benefit of said plaintiffs, the wife and child of said deceased, and that said defendants had paid over some interest or income of the proceeds of said insurance policies to the plaintiffs, and that the defendants received said $5,000, the proceeds of said insurance policy, as trustees,

subject to a trust in favor of the plaintiffs, namely, the wife and child of said deceased, Ezra Ray Bliss, and that said sum of money was received by them knowing that the proceeds were to be held and used for the benefit of the said wife and child. Upon said special findings and the evidence, the court made findings of fact covering the entire case, in accordance with the special verdict of the jury, and found in favor of the plaintiffs upon all the material issues made by the pleadings; and as conclusions of law found that the proceeds of said insurance policy is a trust fund and the property of the plaintiffs, and that the defendants are not fit or proper persons to act as trustees of said trust fund, and entered judgment in favor of the plaintiffs.

I think the evidence is amply sufficient to support the findings made by the court and that the findings are sufficient to support the judgment. There is a substantial conflict in the evidence, and under the well-established rules of this court, the judgment ought not to be disturbed.

The majority opinion holds that the evidence does not show that the beneficiaries named in the policy were ever constituted trustees, and for that reason the appellant took the absolute title to said $5,000. It is there held that the oral testimony is exceedingly meager and desultory, and that it revolves about and refers back to a conversation which took place between the insured and his father shortly subsequent to the birth of the child, and my associates then proceed to quote a very "meager" portion of the evidence, and say: "This constitutes the entire transaction out of which it is claimed this trust arises." I maintain that the testimony quoted is only a meager part of the testimony that tends to show, and does in fact show, that the clear intention of Ezra Ray Bliss was to establish a trust in favor of his wife and child, and that the appellants were intended to be the trustees and nothing more.

It appears from the evidence that the plaintiff's father was unfriendly toward her husband, and the husband in turn conceived a violent dislike for his father in law, Mr. Cook; that the deceased was engaged in the life insurance business,

and after his marriage talked very often to other persons about said policies held by him for the protection of his wife and child. To some of them he stated that his wife was not competent to care for the proceeds of the policies, and knowing that she would naturally look to her father, a successful business man whom he very much disliked, for the investment of the funds, did not change his policy so as to give the proceeds to her directly. It was natural, therefore, for him to be satisfied with his own father and mother as trustees, the beneficiaries named in the policy before his marriage, and I think it was natural to assume that the young man would not allow the only asset, or prospective asset, which he had, of any considerable value, to be given to his father and mother, who already were possessed of ample means, and leave his wife and child almost penniless. It certainly would be a shocking commentary on the character of the young husband to hold that he was willing to leave his wife and child penniless and give substantially all of his property to his father and mother, who were in good financial circumstances, and thus place his wife and child under their absolute control and power; and it seems to me that it reflects on the character of the father and mother, who are sordidly and avariciously trying in this case to prove their son devoid of all feeling for his wife and babe and of the honorable principles and natural impulses which young men like him usually possess. The testimony shows that the young people were hard-up, and the question as to paying the premiums on said policies was discussed between them, and the young husband suggested that the amount of money to be paid annually as premiums on said policy, which was about $300, would give to his wife many comforts and conveniences which she could not have if the policies were kept alive by paying the premiums. She testified that during the money panic in 1907 they were short of funds and were in very straitened circumstances for quite awhile, and her husband said the premium would be due in a short time and he thought he could not meet it, and spoke of giving up the policies so that his wife might enjoy more comforts and things she could not have if he paid the premiums, and she

told him not to give up the policies, that she would help in every way she could to make the payments, and testified that she did do so by doing her own washing and living as economically as possible, and ate only two meals a day for a time; that she saved five dollars a week on living expenses and that she did everything she could to assist him in the payment of the premiums. This, it seems to me, is a very significant fact. The young husband must have been of a peculiar disposition indeed if he wanted to deprive his wife of certain living comforts and thus save money by which to pay the premium on policies, the proceeds of which were to go to his parents in case of his death, and require her to make personal sacrifices for the benefit of the old people who were in affluent circumstances. I should hardly think that any right-minded parents would be willing to give their deceased son the reputation they are attempting to give him in this case.

The plaintiff, Ida Bliss, testified that she had a conversation with Mr. and Mrs. Bliss shortly after her husband's funeral, on the cars between Pocatello and Nampa, and that Mr. Bliss told her that she was well provided for—that she was very well off, and she asked him in what way, and he said by insurance; that there was $10,000 insurance that Ray had, and, of course, it would be paid; and that Mrs. Bliss in that conversation said substantially the same thing. It was repeated that the plaintiff was well provided for by insurance and that she would not need or want for anything. In another conversation she had shortly after that in Emmett, she testified that Mr. Bliss asked her to his house to see him on business and she went and they talked over the insurance policy and he said: "Of course, you know how these papers are made out," and she said, "No, Mr. Bliss, I don't; I have never seen the policies that I remember of," and he went on to say that he and Mrs. Bliss were named as beneficiaries in both policies, but stated: "This money is not ours and we do not claim a cent of it." Mrs. Bliss was present at the time and she said: "No, we don't claim a cent of it; there is not a cent of it belongs to us, and at any time that we should ever use a cent of it, I hope that God will strike us dead."

This conversation occurred about the time the money was paid by the insurance company. During that conversation Mr. Bliss said that they (he and his wife) had agreed between themselves to hold the money in trust for the baby and herself, and that they did not consider that she was competent to loan this money, and thought they would hold it themselves and make the investments for her, and said they would invest the money in a safe place and that she could have the accumulations on the money when they came due, and he asked her if she was satisfied with that and she said she was. She further testified that she told Mr. Bliss during that conversation that she thought she was competent to handle the money herself, and Mr. Bliss replied that it was not Ray's intention that she should hold the money herself, and he went on to tell about being duck hunting with Ray shortly after the baby was born and that he had insisted on Ray's changing the policy to his wife's name, but Bliss said Ray insisted that it should be left the way it was, and stated that he knew his father and mother would take care of his family and not let them want for anything as long as they lived; that he had insisted on Ray's changing it and Ray told him he would not change it, that he would leave it in *"trust"* with them for the baby and herself. Some time after that she went to Mr. Bliss and asked him if he would make some written statement that he would pay her so much a month or so much a year, and he replied that he would not, and said: "You can trust me, Ida, without that," and he promised to give her $1,000 a year, five hundred every six months, and told her to come to him as she would to her own father. She thereafter went to Mr. Bliss and asked him for money and he said he would pay her $500, and in a short time after that he told her that he had something for her at the house, and she thought perhaps it was the $500 that he had promised, so she went to Bliss' house and Mrs. Bliss gave her an envelope, which she did not open until after she left the house, and when she opened it, found an itemized account against her for $574.50, which account included an itemized statement of money paid out by the appellant for funeral ex-

penses of his son, and other matters, and also contained an item of $124.50, money which the plaintiff had placed in Mr. Bliss' hands to carry for her from Pocatello to Emmett. About six months thereafter she again asked her father in law for $500 and he tried to appear surprised that she should ask him for any money at all, and said: "I don't know what you mean by asking me for money," and said that he did not consider herself and the baby any relation to him at all and would have nothing to do with them, that he had dropped them completely—meaning the baby and herself; that they (himself and wife) had changed their minds about the money and Mrs. Bliss had decided they would use it in some other way. They had built a home which had cost them a good deal of money, and the father in law also mentioned a lawsuit he had pending and said it took all the money he had and that he was "broke," anyway, and offered her two dollars, stating she could have that if she wanted it. He also asked her what she had done with her bank account, and she told him. On cross-examination she testified substantially to the same state of facts as she had on direct examination.

Finley Monroe, a disinterested witness on behalf of the plaintiff, testified that within a few days after the burial of Ezra Ray Bliss, he had a conversation with the appellant, Mr. Bliss, in regard to insurance policies or insurance money, and testified as follows:

"Among other things, he stated to me that Ray had $10,000 life insurance at the time of his death and that it was in favor of himself and his wife; now he wanted me to see Ida, he said, as a friend of the family, and impress it upon her the fact that that insurance was hers and the baby's, and that Ray so intended it, and that she might not feel hard towards him by reason of the policy not having been transferred to her before his death; that is, that she would have no resentment against him or feel that he had been instrumental in not doing so; and he stated that not a dollar of it was theirs, and that they would never apply it to their own use at all; that they had plenty, more than they would ever need themselves; that they had nothing in the world to live for, only Ida and

the baby, and that he asked—it was his desire to be appointed guardian of the estate, because he said Ida was but a child and he was satisfied that Ray intended he should look out for them, and he stated that Ray—that he had had a conversation with Ray and told him that he ought to transfer this policy now that he had a wife and baby, and that Ray had said, no, not now, or words to that effect, that 'if anything happens, you will see that they are cared for,' and again—several times he repeated the words that not a dollar of it is ours, that it is hers, and Ray intended it for her; and he asked that I be sure to see Ida and have a talk with her; he said: 'She is nearly sure to go to you, but if it is convenient for me, I will see her myself; she might come to you in regard to the collection of some accounts.' . . . . Mr. Bliss was very much affected and the tears rolled down his cheeks when he was talking about the death of his boy; he stated that if he would be allowed to act as guardian of the estate he would consider it as a trust from his dead boy to carry that trust out for Ida and the baby, and that he would not invest the money in anything common,—mortgages, although he could get ten per cent on them in the way of farm mortgages or dwelling mortgages that a common business man might invest in, but he would invest it so there was no possibility of a loss, and he suggested bonds; he had been to the First National Bank and had a talk with Mr. Hayes, cashier of the bank, with reference to what interest might be gotten from certain bonds, and was informed it would not be over five per cent; he said that would not cut any figure, it would only amount to $500 a year on $10,000, but it would make no difference from the fact that the investment would be such that if at any time Ida might need it she could get and use part of the principal; and all of the money he and his wife had was hers anyway, and he would consider it a pleasure if she would come to him for any needs she might have; that his money was her money. I told him I was confident such would be the case, if it was agreeable to Ida, and at his request, as a friend, I would see her and was satisfied she would come to me, because I had always been a friend of the family and in business

matters I was satisfied she would come anyway. A short time after that Ida came to me and I made known to her what Mr. Bliss had requested, and it was agreeable. Afterward I met Mr. Bliss on the sidewalk and stated to him I had seen Ida and it was entirely agreeable to her; that she had stated to me she was going to suggest it herself; that she felt she wasn't hardly capable from a business standpoint of caring for so much money. Mrs. Bliss was out near the middle of the street in a spring-wagon during the conversation, and she drove up to the sidewalk. I repeated to her the conversation I had had with Mr. Bliss, that it was agreeable to Ida that Mr. Bliss be appointed guardian of the estate. Mrs. Bliss said that not a dollar of it was theirs and not a dollar of it would be used for their benefit; that they had plenty of their own and had nothing to live for except Ida and the baby. She said they would like to have the privilege of assisting in taking care of and educating the baby. She said it was Ray's intention that the money should be Ida's, and it was never intended for them even though it was in their name. That was repeated a number of times. Mr. Bliss repeated that a number of times in the first conversation with him."

It will be observed that according to Monroe's testimony Mr. and Mrs. Bliss repeated a number of times that it was Ray's intention that the money should be Ida's and that it was not intended for them even though it was in their name. They at that time had no doubt of their son's intention and knew what his intention was; but evidently their avarice and greed thereafter got the better of them and they concluded to defeat their son's intention and keep the money themselves.

A Mr. Johns testified on behalf of the plaintiff that he resided in Emmett and that he had a conversation with Mr. and Mrs. Bliss about four months after the death of their son in regard to appraising the insurance money as part of the estate of Ezra Ray Bliss, he being one of the appraisers. He testified that they both agreed that the insurance money should not be appraised as a part of the estate, although they did not intend to use any of it for their own use, as they in-

tended it for the baby—mostly to educate the baby—for Ida and the baby.

Mr. Marquis, who was a resident of Portland, Oregon, and had been affiliated with the Bankers' Reserve Life Insurance Company and was acquainted with Ezra Ray Bliss in his lifetime and worked with him in soliciting insurance for that company, testified that he was quite intimate with Ezra Ray Bliss,—that they were close personal friends and that Ray had talked over intimate, personal matters with the witness and his wife; that he had a conversation with Ezra Ray Bliss in regard to changing the beneficiaries in his policies, and Ezra stated that his wife had not a great amount of business ability and that he did not care to have her burdened with the investment of a great amount of money. Said witness testified: "We talked this matter over in common because I had my estate left in that manner," and that he had some correspondence with the deceased in which the deceased asked him to advise him what to do regarding his insurance so as to get the matter in such shape that he would know the policy would be paid to his wife, or that she should receive the benefit of it.

F. J. Bliss, one of the appellants, was a witness in his own behalf, and testified that he had no recollection of having any such conversations as Ida Bliss testified she had with him on the railroad train. He admitted that he had talked with her but that he had no recollection of any such conversation as she testified to, and he also swore that Ida May Bliss never made any claim to the proceeds of said policies "that he was aware of"; that he had no recollection of telling her what he wanted to do with this money. Q. "What did you tell Ida Bliss with reference to the proceeds of the insurance policy?" A. "I never told her anything about the proceeds of the policy that I know anything about. I don't recall anything about it." He denied in that equivocal way the conversations had with the plaintiff, Ida Bliss, and also denied that he had the conversations testified to by the witness Monroe, and testified as follows: "There was never any conversation [with Monroe] with reference to the insurance poli-

cies. I did state to Mr. Monroe that Ida was very much disappointed in not being the beneficiary in the policies; that the policies were left to Ray's mother and myself and I knew she would be very much disappointed, as she expected they would be made to her. Don't know why they were not made to her." A fair inference from his testimony would be that he knew it was the clear intention of his son to leave the insurance money in his hands in trust for his wife and child. His entire testimony is most unsatisfactory, to my mind, and it evidently was to the minds of the jury and the trial court.

Mrs. Adelaide Bliss testified on her own behalf and for her husband. She denied having any conversation with Ida Bliss on the railroad train between Pocatello and Nampa, as testified to by Ida Bliss; that there was no conversation between them in reference to the proceeds of said insurance policies, and denied that she stated to Ida Bliss, in substance, that "This money is not ours; we don't claim a cent of it and should we ever at any time use a cent of it, I hope that God will strike us dead." The record shows that Mrs. Adelaide Bliss was very likely to make such a statement as this, and it is indicated by the similarity of that language to the language used by Mrs. Bliss when on the witness-stand. She was asked the following question: "What can you say with reference to your agreeing to that conversation and saying that 'I hope God will strike us dead'?" To which she answered: "I can say—ask God to be my witness—that I never remember saying any such thing." That very answer shows that she was addicted to the use of such language as Ida Bliss testified to. She admits in her testimony that she did have a conversation with Ida with reference to the policy or its proceeds and that Ida had spoken to her before in regard to the matter; that Ida spoke of "my insurance policy," and the witness testified that it made her feel queer and she replied, "Ida, that will come out all right." I should think it would have made her feel "queer" as at that time, under the facts of this case, she and her husband were apparently laying their plans to deprive the wife and baby of her deceased son of substantially all of the estate that he left, and to make

them paupers or objects of charity. She further testified that she had another talk with Ida Bliss, at which conversation Ida mentioned something about "my insurance" or "my insurance policies," and witness said, "Why, Ida, you know that you have no insurance policies, as far as I know anything about." And in that conversation she told Ida that Mr. Bliss had said he would give her $500 a year. She further testified: "I never once thought when the money came into our hands that it was Ray's intentions that it should be left to us to provide an income for Ida and the baby." That may be true; the evident avarice and greed of the woman only made her think of retaining it herself. She no doubt concluded that her son was perfectly willing to leave his wife and baby to the charity of the world and give the proceeds of the insurance policy to his own father and mother, who were in affluence at the time and did not need it; and was perfectly willing to have it go out to the world that her son was of the character that would leave his wife and infant child penniless and dependent on the charity of others; that the son would be willing that the wife should scrimp and economize and deprive herself not only of comforts but many necessities in order to save money sufficient to pay the premium upon policies the proceeds of which would go to his already wealthy parents. I should not think parents who had any regard whatever for their deceased son's memory would for $10,000 place such a stigma upon his name. She denies saying to the witness Monroe what he testified that she said. The jury and the court heard the defendants testify, and they concluded from all of the evidence that it was the clear intention of the deceased to leave the proceeds of said insurance policy in trust to the plaintiffs, and I think all of the evidence taken together clearly shows that Ezra Ray Bliss was a decent kind of a young man and was not so heartless as to leave his wife and child in poverty and give almost his entire estate to his parents.

The appellant F. J. Bliss testified that he had given some considerable thought to the matter as to how he could make Ida a gift in order to make her feel that her husband had not

forgotten her.  From that testimony one would infer that he did have an idea that Ida might think her husband had forgotten her when she came to realize that the appellant and his wife were claiming nearly all of the property their son had left.  It seems from the evidence that he appeared to be very anxious to make her a present, but was ready to turn her down every time she asked for money, and finally did offer her the big sum of two dollars.

The majority opinion in effect holds that the deceased was totally wanting in foresight, sentiment or feeling for his wife and child, and states as follows: "In our opinion the insured never thought of creating a trust or naming his parents as trustees, but rather preferred to rely on their sentiments of love and affection and the ties of consanguinity for the care, protection and maintenance by his parents of the wife and babe in event of misfortune overtaking him.  Although his parents strenuously resist this action, it does not appear from this record that these old people will prove recreant to the filial faith and confidence thus reposed, or that they mean to abandon this mother and child or give them no aid or assistance."  The evidence clearly shows to me that they have abandoned them and have refused to give them aid or assistance.  The sentiment of love and affection and the ties of consanguinity so pathetically referred to by my associates evidently did not amount to much so far as these parents were concerned, for as testified to by Ida Bliss, when she asked Mr. Bliss for money, he said, "I am surprised that you should ask me for money.  I don't know why you are asking me for money.  I do not consider you any relation to me.  I have dropped you and the baby together," and then he finally offered her the munificent sum of two dollars. I suppose this offer of two dollars made my associates conclude in their opinion that appellants had not abandoned them.

From all of the evidence and the admissions of the appellants themselves, it is clear that the intention of Ezra Ray Bliss was to leave said money in trust for his wife and babe, and as I view it, to hold that the appellants are the absolute

owners of the proceeds of said insurance policy is to perpetrate a great injustice upon the memory of the deceased and upon his wife and child. Ezra Ray clearly intended to create a trust and did create it and so expressed himself time and again. He did not care to change the names of the beneficiaries in the policies because the persons he desired to act as trustees were already named. He did not care to have his wife and child named as beneficiaries in the policies, for that would have given them the proceeds directly, the thing he wished to avoid. I think Ezra Ray Bliss did as every ordinary man would do under all of the facts of this case. The policy was taken out before he was married. After his marriage he wanted to protect his wife and child and his intention was to have his father and mother take the insurance money as trustees for his wife and babe. They acknowledged time and again that they had so taken it. No particular form of words is necessary to create a trust. (*Garrish v. New Bedford Inst. for Savings,* 128 Mass. 159, 35 Am. Rep. 370.) The existence of a trust is in every case to be determined as a question of fact, having in view the surrounding facts and circumstances of the transaction, the intention of the parties and the substance rather than the form of the instrument. (5 Ency. of Law, 2007, Supp.; *Robb v. Washington etc. College,* 103 App. Div. 327, 93 N. Y. Supp. 92; *Hirsch v. Auer,* 146 N. Y. 13, 40 N. E. 397.) Trusts may be created in personal property by parol and no particular form of words is required to accomplish the result. Trusts of personal property may be created, declared or admitted verbally and proven by parol evidence. (2 Pomeroy on Equity Jurisprudence, p. 1492; *Clapp v. Emery,* 98 Ill. 523; *Reiff v. Horst,* 52 Md. 255; 19 Dec. Digest, p. 1490, pars. 17, 18.) The proceeds of a life insurance policy may be made the subject of a trust. (*Silvey v. Hodgdon,* 52 Cal. 363; *Austin v. Wilcoxon,* 149 Cal. 24, 84 Pac. 417; *Woodruff v. Tilman,* 112 Mich. 188, 70 N. W. 420.)

In *Hirsh v. Auer,* 146 N. Y. 13, 40 N. E. 397, the court said: "The fact that the trust dealt with a contingent interest of the insured in the certificate of insurance is of no moment.

That interest became vested at the death of the insured, and the beneficiary having collected the insurance money, the trust, under the agreement creating and acknowledging it, attached to the fund.'' (See, also, *Catland, Executor, v. Hoyt,* 78 Me. 355, 5 Atl. 775.)

The appellants had no vested interest in said life insurance policy or its proceeds, and it was subject to the free disposal of the decedent at any time. They never had possession of the policy until after Ezra Ray's death. There can be no doubt of the intent of Ezra Ray Bliss in this matter when all of the evidence in the case is taken into consideration. It is a well-established rule that it is not essential for the creation of a valid trust that the trustees know of or consent to the trust. The main contention of the appellants is that the trust was not proven by clear and convincing evidence. The existence of a complete trust is in every case to be determined as a question of fact, having in view the surrounding facts and circumstances of the transaction, the intention of the parties and the substance, rather than the form, of the instrument.

In *Bollinger v. Bollinger,* 154 Cal. 695, 99 Pac. 196, is a statement as to the meaning of clear, satisfactory and convincing evidence to show the creation of a trust by parol, and the court said:

''Appellant invokes the rule that, to prove a trust by parol under conveyance absolute in terms, the evidence must be clear, satisfactory and convincing. The rule invoked is amply supported by authority, and is founded in sound reason. But its proper application, where there is substantial evidence to support the existence of a trust, must be left largely to the trial court. As was said in *Harris v. Harris,* 136 Cal. 379, 69 Pac. 23, 'Whether the evidence in any particular case is of this character [clear, satisfactory, and convincing] must be determined by the trial court, and its determination thereon will be accepted by this court as conclusive.' ''

This court said in *Morrow v. Matthew,* 10 Ida. 423, 79 Pac. 196, as follows:

"Where, however, the record discloses such facts that a fair and reasonable person might conclude therefrom as to the execution, terms and conditions of the contract, I do not see how an appellate court is justified in saying that it did not appear clearly and satisfactorily to the trial court. Evidence entirely clear and convincing to the trial court who saw and heard the witnesses might, when in cold type upon the record, leave doubts in the minds of the members of the appellate ·court, but I do not think they should reverse the judgment on such grounds."

In the case at bar, the jury and court heard the witnesses testify, saw their demeanor on the stand, and upon directly conflicting testimony found in favor of plaintiffs.

It is stated by Perry in his work on Trusts, vol. 1, sec. 137, that "The facts in all cases must be proved with great clearness and certainty, especially when the claim depends upon mere statements; and facts that only base a conjecture that the conditions of a resulting trust existed are insufficient. The certainty required, however, is only such as is sufficient to satisfy the jury of the existence of the trust; and it is error to charge that the 'clearest and most positive proof' must be given." At sec. 159 the same author says: "If the declaration of trust is too imperfect to establish that purpose, and yet plainly shows that the intention was that the donee should not take beneficially, and that the sole purpose of the gift or grant was to carry out the purpose of the trust, which fails, the donee will take in trust for the donor of his heirs," and not for himself.

In regard to the declarations that were made by the insured as to his intention to make the beneficiaries therein named trustees for the plaintiff, we think such declarations were amply sufficient to show, and do show, what his intentions were.

In *Gerrish v. New Bedford etc. Bank, supra,* the court said in regard to such evidence:

"At the trial, this evidence was rejected, because, in the opinion of the judge, the testator had not done what was

necessary to create a trust.   But whether he had done enough depended, as we have seen, on whether his conduct and declarations manifested a completed and executed intention in regard to it.   Notice to the donee is indeed not necessary when other acts or declarations of the donor are sufficient and complete in themselves; but, where the transaction is capable of two interpretations and the settlement is merely voluntary, it is plain that notice given by the donor to the donee of the existence of the trust would in most cases be decisive on  the  question of  intention. . . . . It is not only satisfactory evidence of an executed intention, but it is a declaration in the nature of an act necessary to complete the transaction and create the trust.''

Counsel for appellant states in his printed brief that appellants were completely heart-broken by the death of their only son and sought solace in the affection and companionship of his wife and child and wished as a matter of parental love to protect and care for them.   This statement, under the evidence in this case, goes to the very limit.   Appellants sought solace for the death of their only son, not in the affection and companionship of his wife and child, but in depriving them of the substance of the son's estate and sending them out almost penniless on the cold charity of the world or to her own father for support and maintenance.   It is stated in Holy Writ, Gen. 2, 24, ''Therefore shall a man leave his father and mother and cleave unto his wife; and they shall be one flesh''; but my associates have concluded that this case is an exception to the rule and the husband should desert his wife and child and cleave unto his father and mother.

The majority in their opinion says: ''Another thing must not be lost sight of in this case.   This suit involves the benefits under an insurance contract which is one of the most sacred contracts that can be made.''   Why talk about the sacredness of this policy when it was taken out long before the insured had married the plaintiff and when the evidence shows that the beneficiaries were named without their knowledge or consent and the contract was kept under the control of the insured?   They had no vested right in it.   Is it any

more sacred than a will? I say no. Under the statutes of this state, sec. 2736, Rev. Codes, if after having made a will the testator marries and the wife survives him, the will is revoked unless certain things therein mentioned exist. Why talk about the sacred rights of an insurance contract in a case where the beneficiary has no claim against the insured for an indebtedness due from him and no claim whatever that would begin to measure up to the claim of the insured's wife and babe, and when it clearly appears from the statements and admissions of the beneficiaries that they knew it was the intention of the insured to leave the amount due on the policy to his wife and child? The sacred rights of the wife and child ought to count for more with a court of conscience than the avarice and greed of the father and mother of the insured.

The judgment of the trial court ought to be sustained, with slight modification.