885 P.2d 1153

**ESTATE OF William R. HULL and Dorothea B. Hull, Plaintiffs–Appellants,**

v.

**Glen WILLIAMS, Defendant–Respondent.**

No. 21039.

Court of Appeals of Idaho.

Nov. 30, 1994.

438

Peterson Law Office, Lewiston, for appellants.

Ricks & Ramey, Boise, for respondent.

LANSING, Judge.

Dorothea Hull (Dorothea), wife of the decedent, William R. Hull (William), brought this action in her individual capacity and as personal representative of William's estate. She alleged that shortly before William's death, she and William transferred certain community property to William's son, Glen Williams (Glen), with the intent to create a trust to benefit the grandchildren of Dorothea and William. Dorothea acknowledges that the intended oral trust failed for lack of specificity of terms, but contends that the transferred property is consequently impressed with a resulting trust in her favor and that Glen is obligated to return the property to her. Following a court trial, the district court found that the property in question was the separate property of William, that he made an *inter vivos* gift of the property to Glen, and that Dorothea has no interest in the property. Because we conclude that the district court erred in its findings of fact and application of law, we vacate the judgment and remand for further proceedings.

## I.

## FACTS AND PROCEDURAL BACKGROUND

William, then age 78, and Dorothea, then age 73, were married in 1983. This was William's fourth marriage and Dorothea's second. The marriage lasted for more than eight years and ended on William's death at the age of 86. William did not leave a will, and Dorothea was his primary heir by intestacy.

William also had a son, Glen, whom he had abandoned as an infant during the Depression. William and Glen had become reacquainted in 1967 and subsequently maintained close contact. William often telephoned Glen, who resided in California, and Glen visited William at various times at William's home in Lewiston, Idaho. On two occasions in early 1992, just prior to William's death, William and Dorothea transferred certain assets to Glen. Dorothea contends that these transfers were made to Glen with the intent that an educational trust be established for the benefit of William's and Dorothea's thirty-five grandchildren and great-grandchildren. She also contends that the primary reason for transferring the assets at that time was to shield them from potential claims of health care providers because William was gravely ill. Glen disavows

any knowledge of an intent to create a trust and contends that William gave him the assets as an outright gift.

After William's death, Dorothea wrote to Glen inquiring about the alleged trust and how it was being managed. Glen did not answer this letter. Dorothea wrote again, sending the letter by certified mail, but it was not accepted. Dorothea testified that she also telephoned Glen to ask how the trust was being managed, but did not receive a satisfactory response.

Dorothea eventually consulted an attorney who filed the present action seeking to enforce the terms of the trust or in the alternative to compel return of the assets to Dorothea. Following a court trial, the district court found that Dorothea had failed to prove that a trust was created. Although the district court found that Dorothea was being truthful in her statements in court, the court also found that the transferred assets were William's separate property and that William had intended to give the assets to Glen as an outright gift. The court therefore granted a judgment in favor of Glen from which Dorothea appeals.

The issues before this court are, 1) whether the district court erred in characterizing the property at issue as William's separate property; and 2) whether the district court erred in not imposing a resulting trust upon the property at issue for the benefit of William's estate and Dorothea.

## II.

## STANDARD OF REVIEW

■ Where a trial court sits as a finder of fact without a jury the court is required to enter findings of fact and conclusions of law. I.R.C.P. 52(a). Our review of the trial court's decision is limited to ascertaining whether substantial, competent evidence supports the findings of fact, and whether the trial court correctly applied the law to the facts as found. I.R.C.P. 52(a); *Cummings v. Cummings,* 115 Idaho 186, 188, 765 P.2d 697, 699 (Ct.App.1988); *Bischoff v. Quong–Watkins Properties,* 113 Idaho 826, 828, 748 P.2d 410, 412 (Ct.App.1987). The task of weighing evidence and finding facts is within the

province of the trial court, and we give due regard to the trial court's opportunity to judge the credibility of witnesses. *Rueth v. State,* 103 Idaho 74, 77, 644 P.2d 1333, 1336 (1982); *Javernick v. Smith,* 101 Idaho 104, 609 P.2d 171 (1980); *Roemer v. Green Pastures Farms, Inc.,* 97 Idaho 591, 548 P.2d 857 (1976). We will not set aside the trial court's findings if they are supported by substantial, competent evidence. *Rueth,* 103 Idaho at 77, 644 P.2d at 1336 (1982).

## III.

## ANALYSIS

### A. COMMUNITY PROPERTY ISSUES

In this case the parties present differing perceptions of the transfers to Glen. Correct resolution of this dispute turns upon the intent of the owner or owners of the property who made the transfers. It is thus necessary to determine at the outset who owned the assets in order to ascertain whose intent is relevant.

■ If an asset is community property it cannot be given away without the consent of both marital partners. *Koenig v. Bishop,* 90 Idaho 182, 186, 409 P.2d 102, 103 (1965); *Anderson v. Idaho Mutual Benefit Association,* 77 Idaho 373, 292 P.2d 760 (1956). Therefore, if the transferred assets were property of the marital community, both Dorothea's and William's intent is relevant. On the other hand, if the property at issue was William's separate property, William's intent alone determines whether a gift or a transfer in trust occurred.

■ An asset's character as community or separate property depends upon the date of its acquisition and the source from which it was acquired. All property of either the husband or the wife owned by him or her before marriage, that acquired afterward by gift, bequest, devise or descent, and that acquired with proceeds of separate property is separate property. I.C. § 32–903. All property that is otherwise acquired after marriage by either the husband or wife is community property. I.C. § 32–906. Income generated from separate property is

community property. *Id.* Under the so-called "source doctrine," an asset that is acquired as or with the proceeds of separate property becomes separate property, and if community property is used to acquire the asset, the asset becomes community property. I.C. § 32–903; W.J. Brockelbank, THE COMMUNITY PROPERTY LAW OF IDAHO, § 3.2 at 122 (1962).

■ All property acquired during the course of a marriage is presumed to be community property. *Shumway v. Shumway*, 106 Idaho 415, 420, 679 P.2d 1133, 1138 (1984); *Stanger v. Stanger*, 98 Idaho 725, 727, 571 P.2d 1126, 1128 (1977). This presumption places the burden of persuasion on the party contending that certain assets are owned separately by one spouse. That party must prove "with reasonable certainty and particularity" that the property is separate. *Houska v. Houska*, 95 Idaho 568, 570, 512 P.2d 1317, 1319 (1973); *Stahl v. Stahl*, 91 Idaho 794, 797, 430 P.2d 685, 688 (1967). This may be done by establishing that the property was acquired by one spouse prior to the marriage, by tracing the funds used to acquire the asset to a separate property source, or by showing that the property was acquired by gift, bequest or devise during the marriage. I.C. § 32–903; *Cummings*, 115 Idaho at 190, 765 P.2d at 701; *Shumway*, 106 Idaho at 420, 679 P.2d at 1138. Where the source of an asset is unknown or unprovable, by application of the community property presumption the asset is deemed community property even though no evidence exists as to its community nature. Brockelbank, *supra*, § 3.5.1 at 136.

In the case before us, Dorothea testified that before their marriage William owned a mobile home which he later sold for $3,500, some unidentified stocks and a checking and savings account at West One bank with unknown balances. She also said that William had told her at the time of their marriage that he was "in pretty poor financial condition" because of medical expenses incurred during his previous wife's three-year illness. Dorothea owned a mobile home in which the couple resided, a used car and a modest bank account at West One.

Both Dorothea and William had income from Social Security and retirement benefits throughout their marriage. At times during the marriage William also had earnings from employment selling materials by telephone for a construction company. After getting married, Dorothea and William did not combine their respective bank accounts; they continued to maintain their individual checking accounts into which were deposited their respective Social Security and retirement benefits and William's earnings. Both spouses' names were placed on each of the accounts, however, and either spouse was authorized to sign checks on the accounts.

The assets at issue here are funds that were held in an account known as the "Dreyfuss account" and transferred to Glen by five separate checks, and assets that had been kept in a safe-deposit box, including ten gold coins, stock certificates for approximately eight hundred shares of utility stocks, ten or twelve rolls of silver dimes, and some miscellaneous silver coins. On review of the trial court's finding that these assets were entirely William's separate property, our focus is upon any evidence indicating the date or source of acquisition of these items.

The Dreyfuss account was used by William for stock market investments and apparently included proceeds from his investments. The account was maintained under both spouses' names. The evidence is indefinite as to the date when this account was opened and the source of the monies deposited. Dorothea testified that the account was established after her marriage to William. However, this testimony was somewhat impeached by her prior deposition testimony that she could not recall when the account was established. No documentary evidence was introduced to indicate either the inception date of the account or the source of deposited funds. Dorothea did testify, however, that she wrote checks to the Dreyfuss account from the checking account that was funded by her Social Security checks and retirement benefits. She said that William invested this money that she contributed to the Dreyfuss account. There was also testimony that the Dreyfuss account included accumulated interest.

Dorothea said that the gold coins taken from the safe-deposit box were purchased during the marriage, that William began buying the coins in 1983, and that he gave each coin to her as a present upon acquisition. Glen, on the other hand, said that his father had possessed "some" gold coins and had promised them to Glen prior to the marriage. Dorothea acknowledged that William owned the silver dimes and the other silver coins prior to the marriage.

Evidence on the origin of the stock certificates in the safe-deposit box was equivocal. Although there was testimony that William had owned stocks before his marriage to Dorothea, there was no evidence identifying the companies or indicating the number of shares he then owned. There was also testimony that William engaged in stock trades throughout the marriage. Thus, there was no clarity as to whether the stocks held in the safe-deposit box more than eight years after the marriage were the same stocks or traceable to the stocks that William had owned as a single man. On cross-examination, however, when asked whether "all of the things which were in his safe-deposit box were there at the time you married him, except for the gold coins," Dorothea responded, "I would say yes."

With this evidence before it, the district court concluded that Glen had introduced sufficient evidence to establish that the funds in the Dreyfuss account and all the items taken from the safe-deposit box were William's separate property.

■ The trial court's finding that the silver dimes and other silver coins from the safe-deposit box were William's separate property is affirmed. William's separate ownership of those items was established by Dorothea's admission that he owned those coins before marrying her.

As to the remaining property, however, the district court's analysis of ownership was flawed. The district court determined that the community property presumption was rebutted by evidence that William was 78 years old when he married Dorothea, that their marriage was of eight years' duration, which the district court characterized as "relatively short," and that William had begun investing in the stock market before the marriage. The district court apparently concluded that because of William's advanced age, he must have owned these assets before he married Dorothea. This assumption, however, in the absence of any evidence of the origin or a pre-marriage date of acquisition of the particular assets in question is incompatible with the community property presumption. Indeed, it amounts to an inverse presumption that assets are separate property for those married late in life.

■ In concluding that the Dreyfuss account funds were William's separate property, the district court also relied upon evidence that Dorothea had minimal knowledge of William's investment activity and only issued checks out of the Dreyfuss account at William's direction. The district court's focus upon whether Dorothea managed the assets is misplaced. Either marital partner may manage and control community assets, I.C. § 32–912, and an arrangement that one spouse will exercise exclusive control does not, without some evidence of a separate property origin, overcome the presumption that the assets are community property.

■ We conclude that the community property presumption was not overcome with respect to the Dreyfuss account and the gold coins. Glen did not meet the burden to prove with reasonable certainty and particularity that these assets were William's separate property. There was no evidence that the Dreyfuss account preexisted the marriage or that any separate property was on deposit in the account. Nor is there evidence that the gold coins in the safe-deposit box were the identical coins owned before the marriage, were proceeds of the same, or were otherwise traceable to a separate property source. While the district court was not obligated to accept Dorothea's testimony, it was required to apply the presumption in favor of community property in the absence of any substantial, competent evidence that the assets in question were owned by William before marriage, were acquired by him thereafter by gift, bequest or devise, or were the proceeds of identified separate property. Because no substantial evidence was present-

ed to show that the Dreyfuss account or the gold coins were William's separate property, the community property presumption mandated a finding that these assets were community property. Accordingly, we conclude that the district court erred when it found that these assets were separately owned by William.

The evidence of ownership of the stock certificates is more problematic. No documentary evidence was offered to show when the certificates were issued. Dorothea testified that William engaged in stock trades throughout their acquaintance and that she did not know which stocks he owned at the time of marriage. There was, however, at least slight evidence that the stock certificates in the safe-deposit box were owned by William pre-marriage through Dorothea's response on cross-examination indicating that "all of the things which were in the safe-deposit box" were there at the time of marriage except the gold coins. This testimony provides some evidence that the stock was William's separate property. However, the district court did not expressly rely upon that testimony for its finding that the stocks were separately owned. Rather, the district court relied upon its analysis which we have found to be erroneous attributing undue significance to William's advanced age at the time of marriage and Dorothea's minimal involvement in investment activity through the Dreyfuss account. Because the trial court's finding that the stock was separate property was predicated, at least in part, upon this incorrect analysis, this finding is vacated, and the question of ownership of the stock certificates may be reconsidered by the court on remand.

## B. NATURE OF THE TRANSFERS

We turn now to the dispute as to whether the transferred property was a gift or was intended to be the corpus of a trust.

A trust is a fiduciary relationship in which one person is the holder of legal title to the property subject to the beneficial interest of another. See, 1 George Gleason Bogert, THE LAW OF TRUSTS AND TRUSTEES § 1 at 1–2 (Revised 2d ed. 1984); RESTATEMENT (SECOND) OF TRUSTS, § 2 at 6 (1957). The essential characteristics of a trust relationship are separation of the legal title from the beneficial interest and the existence of fiduciary duties. *In re Eggan's Estate*, 86 Idaho 328, 337, 386 P.2d 563, 568 (1963).

An express trust in personal property may be established by expression of the parties either orally or in writing. RESTATEMENT (SECOND) OF TRUSTS § 24. A trust is created only if the settlor properly manifests an intention to create a trust. *Garner v. Andreasen*, 96 Idaho 306, 308, 527 P.2d 1264, 1266 (1974); RESTATEMENT (SECOND) OF TRUSTS § 23. This manifestation of intent need not incorporate any specific language, and the intent may be expressed by written or spoken words or by conduct. *Id.* § 24. There must be certainty, however, as to the property to be subjected to the trust, the identity of the beneficiaries, and the manner in which the trust fund is to be administered and used. *Bliss v. Bliss*, 20 Idaho 467, 476, 119 P. 451, 454 (1911); Bogert, *supra*, § 45 at 483.

In this case, the district court found that an enforceable trust had not been proved due to lack of evidence of specific terms, such as how the trust was to be administered and distributions made to beneficiaries. This finding is not challenged on appeal. Dorothea concedes that the district court was correct in finding that the intended trust was unenforceable due to inadequate specificity of terms.

Dorothea does, however, take issue with the trial court's further conclusion that the assets in question were gifted to Glen. A gift occurs when a grantor delivers property to another with a manifested intent to make a gift of the property. *Matter of Estate of Lewis*, 97 Idaho 299, 302, 543 P.2d 852, 855 (1975). Delivery is accomplished by actions relinquishing all present and future dominion over the property. *Id.; Boston Insurance Company v. Beckett*, 91 Idaho 220, 222, 419 P.2d 475, 477 (1966). An intent to make a gift may be proven by direct evidence such as statements of donative intent or may be inferred from the circumstances, including

the relationship of the donor and donee. 38 C.J.S. *Gifts* § 15 at 792 (1943).

■ Because we have held that the involved property must be deemed community property, the intent of both William and Dorothea determines the legal consequence of the transfers to Glen. As noted above, under Idaho law, one spouse may not make a gift of community property without the consent of the other. *Anderson,* 77 Idaho at 378, 292 P.2d at 763. If one spouse unilaterally attempts to give away community property during the life of the grantor, the non-consenting spouse may set aside the gift in its entirety. Following the death of the grantor spouse, the gift may be avoided only to the extent of the non-consenting spouse's one-half interest. *Id.* at 380, 292 P.2d at 764; Brockelbank, *supra,* § 3.11 at 256–57. The testimony is in conflict as to whether the transfers were intended to be a gift to Glen or to create the corpus of a trust. Glen testified that in February 1992, while he was visiting at William's and Dorothea's home in Lewiston, William expressed remorse for having abandoned Glen as an infant and, in an effort to make amends, said he wanted to give Glen the bulk of his assets. Glen then told William that if he intended to make cash gifts, he should write checks for less than $10,000 so as to avoid scrutiny by the Internal Revenue Service. Glen testified that he later received in the mail four checks for $9,500 each and another check for $26,000. During a second visit in March 1992 while William was hospitalized, according to Glen, William again expressed his wish that Glen receive the bulk of William's property as a gift and instructed Dorothea and Glen that the property held in the safe-deposit box should be delivered to Glen.

Dorothea presents a substantially different version of the events. She testified that during Glen's February 1992 visit, she, William and Glen discussed William's failing health and his concern that the couple's assets not be consumed by nursing home costs in the event that nursing home care became necessary. Dorothea said that during this conversation both she and William expressed their desire that their assets instead be placed in an educational trust fund for the benefit of their grandchildren and great-grandchildren. In response to these expressions, Glen stated that he would handle everything. Then, according to Dorothea, Glen instructed her to draw on the Dreyfuss account four separate checks for $9,500 each, to stagger the dates so they would not appear to have been written on one occasion, and to write the word "gift" on the memo line of each check. Dorothea said that she did as instructed, giving the four checks to Glen, and that she later wrote a final check for $26,000 and mailed it to Glen.

Dorothea claims that in March 1992, at William's behest, she and Glen went to the bank, and Glen took the items at issue from the safe-deposit box. Dorothea understood this property was to be added to the trust corpus. Dorothea said that at that time she expressed doubt as to whether it was appropriate for the couple to hide their assets in this fashion,[1] to which Glen responded that she had better place the property with him or she would lose it all. Dorothea testified that she reluctantly accepted the advice of Glen and her husband and allowed Glen to take the property.

Dorothea denies that she intended the transfers to be gifts to Glen, denies any belief that her husband had such an intent, and, if her husband did intend the transfers to be gifts, denies that she consented to such a disposition of the community property. In addition to explaining her belief that the property was to be held by Glen in an educational trust, Dorothea argues the incongruity of an assertion that she, a woman of modest means whose primary asset is a mobile home, whose income is limited to Social Security and retirement benefits, and who has children and grandchildren of her own, would have consented to gifting most of her community property to Glen, a man with whom she shares no blood relationship and who had little need for the assets, the trial testimony indicating that his net worth is

---

1. There is no contention or evidence that any of William's or Dorothea's creditors were in fact defrauded or deprived of payment as a result of the transfers to Glen, nor is it asserted that the trust was for an illegal purpose.

approximately four million dollars. Glen, however, contends that Dorothea's actions speak louder than her words, and that her consent to and participation in the gifts is evidenced by her removing items from the safe-deposit box and delivering them to Glen and by her writing the checks to Glen and placing the notation "gift" on each check.

The district court found that William intended to gift the property at issue to Glen. Glen's testimony, though controverted by Dorothea, would be sufficient to support this finding if the finding had been made under a correct perception of the ownership of the property. However, because this finding may have been influenced by the trial court's incorrect conclusion that all the transferred assets were William's separate property, this case will be remanded for reconsideration of this factual issue in light of our conclusion that the community property presumption was not overcome as to most of the assets.

Further, the trial court did not squarely resolve the question of Dorothea's intent, for it did not make precise and consistent factual findings as to Dorothea's understanding of the transfers. The court addressed this point in a contradictory fashion. On the one hand, the court stated that it "makes no finding that Dorothea was being anything other than truthful in her testimony," and that "the Court is satisfied that Dorothea appeared sincere in her wish to create a trust." On the other hand, the court's findings also state, "the Court is ... unconvinced that the intention of William and Dorothea at the time of transfer was to give the $64,000 to Glen in trust," and that, "The plaintiffs have failed to establish by clear, satisfactory and convincing evidence that they intended to create a trust relationship between Glen and their grandchildren and great-grandchildren." These divergent findings cannot be reconciled. If, as the court initially found, Dorothea's testimony is true, that testimony establishes that she did not intend a gift to Glen of her community assets and believed that the transfers to him were in trust.

It is the province of the trial court, not this court on appeal, to resolve conflicts in the evidence, evaluate witnesses' credibility and make factual findings. Therefore, on re-mand the trial court must clarify its findings to specifically determine whether Dorothea intended that any or all of the community property assets would be gifted to Glen or consented to such gift, or whether she participated in the transfers with the belief that the assets would be held by Glen in trust.

■ For guidance on remand we address briefly Dorothea's assertion that Glen holds the property in a resulting trust for Dorothea's benefit. A resulting trust arises by implication of law rather than by contract or expression of the trustor. *Hawe v. Hawe*, 89 Idaho 367, 375, 406 P.2d 106, 110 (1965); *Shepherd v. Dougan*, 58 Idaho 543, 553–54, 76 P.2d 442, 445 (1937).

> A resulting trust arises where a person makes or causes to be made a disposition of property under circumstances which raise an inference that he does not intend that the person taking or holding the property should have the beneficial interest therein, unless the inference is rebutted or the beneficial interest is otherwise effectively disposed of.

RESTATEMENT (SECOND) OF TRUSTS § 404 (1959). *See also Bengoechea v. Bengoechea*, 106 Idaho 188, 193, 677 P.2d 501, 506 (Ct.App.1984).

■ Imposition of a resulting trust does not depend upon a showing that the trustor manifested an intention to create it. Rather, a resulting trust arises from circumstances which raise an inference that the transferor of property did not intend to give the transferee the beneficial interest in the property. If the transferee was not intended to have the beneficial interest, and if no other effective disposition is made of it, the person who made the transfer or his estate is entitled to the property. RESTATEMENT (SECOND) OF TRUSTS, Introductory note to § 404 at 324 (1959). If one creates or attempts to create an express trust, "the inference is that he did not intend that the trustee have a beneficial interest in the property; and if he had foreseen that the trust would fail ... he probably would have desired that the trustee reconvey the property to him." *Id.* Although resulting trusts commonly arise where an express trust, validly created, be-

comes unenforceable or fully accomplished without exhausting the entire corpus, *see* Bogert, *supra*, § 468, such is not a prerequisite to formation of a resulting trust. Our Supreme Court has said that, "As a general rule, where a conveyance of property is made without a valuable consideration therefor, express or implied, and is not intended as a gift, a resulting trust arises in favor of the grantor." *Hawe*, 89 Idaho at 376, 406 P.2d at 110, *quoting* 89 C.J.S. Trusts § 98 at 940 (1955).

Accordingly, if the district court finds on remand that neither William nor Dorothea transferred their property to Glen with the intent that Glen would hold the beneficial interest, the court should impose a resulting trust for the benefit of William's estate and Dorothea, and order return of the property to them. If the court finds that both William and Dorothea gifted the property to Glen, wishing him to have all legal and equitable title, then no resulting trust would arise. Finally, if the court finds that William intended a gift, but that Dorothea did not, then Dorothea's one-half interest in the community assets must be impressed with a resulting trust, and Dorothea is entitled to recover her share from Glen.

The judgment of the district court is vacated, and the case is remanded for further findings regarding the separate or community character of the utilities stocks and regarding the intent of William Hull and Dorothea Hull in transferring the assets at issue to Glen Williams.

Costs to appellant. No attorney fees are awarded on appeal.

WALTERS, C.J., and PERRY, J., concur.