# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 49678

In the Matter of: Wylie Street Emergency Fund.

-----------------------------------------------------

INTERNATIONAL RESCUE COMMITTEE (IRC), Trustee of the Wylie Street Emergency Fund,

  Petitioner-Respondent-Respondent on Appeal,

v.

MUSTAFA G. MOHAMMED and EKHLAS AL KHUDHUR, Beneficiaries,

  Respondents-Appellants,

and

MAIDA JASIM, MUSTAFA MUTLAK, Beneficiaries,

  Respondents-Respondents on Appeal,

and

BIFITW KADIR, RECEP SERAN, AHMED MANLA and ASMAA MANLA, Beneficiaries,

  Respondents.

Boise, May 2023 Term

Opinion filed: September 12, 2023

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Gerald F. Schroeder, Senior District Judge. Lynnette McHenry, Magistrate Judge.

The decision of the district court is <u>affirmed</u>.

Cozakos & Centeno, PLLC, Boise, for Appellants Mustafa G. Mohammed and Ekhlas Al Khudhur. Shelly Cozakos argued.

Shaila Buckley Law, Boise, and Bjorkman Dempsey Foster PLLC, Boise, for Respondent International Rescue Committee. Jennifer Schrack Dempsey argued.

Givens Pursley LLP, Boise, for Respondents Maida Jasim and Mustafa Mutlak.

_____


MOELLER, Justice.

This case concerns the distribution of charitable donations received by the International Rescue Committee ("IRC) to aid four refugee families and others in the refugee community who were victims of a mass stabbing incident in Boise, Idaho, in 2018. Mustafa Mohammed and Ekhlas Al Khudhur ("Appellants") challenge the magistrate court's order approving the final distribution of funds as proposed by IRC. IRC calculated the final distribution of donated funds to the families using a formula of its own creation based on methodology and principles developed by Kenneth Feinberg, an expert on compensation fund valuation and distribution following high-profile, mass tragedies.

The district court, acting in its intermediate appellate capacity, affirmed the magistrate court's order, which held that a trust had been created and that the proposed distribution method for the donated funds was within IRC's discretion as trustee. On appeal to this Court, Appellants argue that the district court erred in affirming the magistrate court's decision. Appellants assign three points of error to the magistrate court's decision: (1) it erred in determining there had been a trust created, (2) it erred in its conclusion that IRC's final distribution was reasonable or within IRC's discretion, and (3) it erred in prohibiting Appellants from presenting evidence of their respective injuries from the attack. For the following reasons, we affirm the decision of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 30, 2018, a man attacked a gathering of refugee families with a knife as they attended a party celebrating a child's birthday. The attack occurred at an apartment complex on Wylie Street in Boise, Idaho, where multiple refugee families resided. The mass stabbing resulted in the death of one child, paralyzed a mother, and caused numerous other physical injuries and trauma to individuals in four families. Additionally, other families and individuals in the area's refugee community were also adversely impacted by the attack.

This tragic incident was widely reported in the media, and significant local and nationwide support and sympathy poured into Boise's refugee community in the aftermath of the attack. A coalition of individuals, agencies, and churches reached out in response to help those who were harmed. Among these organizations was IRC, an international humanitarian organization that aids refugees and has an office in Boise. IRC set up a fundraising campaign on its website with information on how to donate to the Wylie Street Emergency Fund to help refugees who had been harmed in the attack. The web page stated:

> Help refugees hurt by the attack in Boise now[.]
>
> Donate now to help the refugee families who were hurt by the attack at an apartment complex in Boise, Idaho. Your contribution to these families will provide them with the critical support they so desperately need.
>
> Your gift will also support our work in Boise as we provide counseling and other services to the refugee community shaken by this incident. We are supporting families to find and pay for temporary housing and providing travel logistics for those needing medical care out of state.
>
> Contributions to families are not tax-deductible.

According to IRC, the disclosure that contributions were not tax-deductible was included "because the beneficiaries [were] known ahead of time," and the donations "would be applied both to the direct victims and to the broader refugee community impacted by the event."

> Donors received letters from IRC thanking them for their contributions. The template for the letters stated:

> On behalf of everyone at the International Rescue Committee in Boise please accept my sincere thanks for your generous gift of (AMOUNT), which we received on (TAX_DATE), to help the victims of the attack against refugees in our community. Your gifts [have] been immediately deployed to help the families impacted by this attack.
>
> Your gift will help to pay for temporary housing, providing travel logistics, helping to pay for the emergency airlift for victims needing out-of-state medical care. The IRC will continue to cover medical bills, and provide counseling to the refugee community as the needs arise. There will be needs far into the future, as families grieve and recover. The IRC in Boise will provide trauma counseling and other services for the refugee community as the needs arise.
>
> Because gifts are directed to specific individuals impacted by this attack, your gift is not tax-deductible. This will serve as the International Rescue Committee's receipt to you, please retain it for your records.

We are grateful to you for being an important part of the IRC community and for your commitment to our ongoing mission of helping people on their journey from harm to home.

Thank you for your continued partnership in support of those we serve.

Additional letters were sent by email with the following language:

We would like to extend heartfelt thank you for stepping forward to support the victims of the attack against refugees in Boise. Your gift will be put to good use, helping those affected to heal and move forward with their lives.

Money raised will be used for services to the victims and their families who were physically injured or killed, and depending on need, the refugee community impacted by the attack. The spending of the funds will be prioritized based on need, to medical bills, rehousing, lost wage replacement, child care for families rendered unable to care for children, mental health and other need-based services.

We hope you take pride in the story of compassion and care that you are making. Your support has been a beacon of hope to those affected by the attack.

Thank you!

Over several months, IRC collected $445,596.08 for the Wylie Street Emergency Fund. As donations came in, they were assigned a specific code by IRC so "that they were limited in purpose" to the Wylie Street Emergency Fund. IRC made several partial distributions to the four families to cover medical and rehabilitative expenses incurred as a result of the attack. These payments were made to meet the victims' immediate needs. IRC did not apply any of the Wylie Street Emergency Fund to its staff's salaries or overhead. In fact, for the first three months following the attack, IRC applied all donations made to its general office fund to the Wylie Street Emergency Fund under the assumption that any generalized donations were actually intended for the Wylie Street refugees.

In order to "track all expenses and be accountable for the donations coming in," IRC directly paid many of the medical bills and other expenditures incurred by the victims from the four families who experienced physical injuries. IRC also reviewed specific fund requests from the affected families and reimbursed them as they submitted receipts for their expenses. In addition to the distributions to the four families, additional distributions were made to other persons affected by the attack in order to meet the needs of the wider refugee community. Examples of these distributions included:

- Assisting in the payment of utility bills for a tenant whose child had been chased by the attacker and whose husband left her after the attack.

- Relocating a tenant after threats were made to her safety because she knew the attacker and had hosted him in her home.

- Providing mental health group sessions for the community.

- Helping Calvary Chapel install a playground at the Wylie Street apartment complex.

- Assisting a family whose child had been chased by the attacker and had lost two weeks of wages.

- Assisting a witness in purchasing a new phone at the request of the Boise Police Department after they confiscated the witness's phone for evidence.

As with the four families directly impacted by the attack, these distributions and services were intended to meet the community's immediate needs. Importantly, none of the prior distributions by IRC from the Wylie Street Emergency Fund have been challenged on appeal.

After meeting all these expenses for specific families, individuals, and the greater refugee community impacted by the attack, IRC determined that the remaining funds should be allocated among the four refugee families who experienced physical injury or loss of life. The final distribution formula proposed by IRC was based on the principles and methodology of Kenneth Feinberg, a compensation attorney and expert on allocating victim funds in large scale disasters. Feinberg was known for his work in creating objective methodologies for distributing compensation funds to the victims of the September 11, 2001 attacks, the 2007 shooting rampage at Virginia Tech, and the 2010 BP oil spill. He has provided advice on distributions following numerous other mass tragedies. After learning of Feinberg and his methodology through an NPR podcast, IRC's executive director conducted additional research on Feinberg's principles and methods, "review[ed] distribution methodology used by various mass casualty funds," and presented a plan to IRC's leadership and legal counsel for distribution of the Wylie Street Emergency Fund.

IRC's formula focused on the number of days each family member spent in the hospital following the attack, rather than the nature or extent of their various injuries. This was done to create an objective evaluation and fairer distribution. Hospitalization was an experience shared by each of the four families who suffered physical injuries and death. IRC's formula specifically "prioritize[d] and award[ed] a fixed amount per death" and then scaled the remaining funds based on the number of days of hospitalization as an indicator of the severity of injuries. The disbursement for injuries was weighted and calculated using "rough proportionality" "because

strict proportionality would reduce the disbursement to the families with lesser injuries to almost nothing, due to the fact that one individual's hospital stay was much longer than the others."

On February 19, 2020, IRC filed a registration of trust with the magistrate court. No objection to the registration was filed by any party. The registration explained that the Wylie Street Emergency Fund was a trust created by IRC following the attack and it included donated funds "to provide support to the families whose family member(s) were injured by the attack as well as to provide counseling and other services to the refugee community shaken by this incident." The same day IRC filed its registration of trust, IRC also petitioned the magistrate court for approval of a final distribution of the trust's funds to the four families injured in the attack. Again, no objection was filed by any party.

About a month later, on March 25, 2020, IRC filed an updated petition for final distribution. This was done to revise the proposed payments to account for a $5,000 emergency payment at the request of Appellants. IRC simultaneously distributed $5,000 to each of the other three families. When Appellants requested another $5,000 distribution later that year, IRC again distributed $5,000 to each of the four families and filed a second updated petition with the magistrate court on June 11, 2020. Once again, no objection to the petition for final distribution was filed by any party. Instead, Appellants filed a pretrial memorandum to argue that no express trust had ever been formed. In the alternative, they argued that even if a trust had been formed, IRC breached its fiduciary duties. Under both arguments, Appellants maintained that the final distribution should be divided evenly among the injured families.

In August 2020, Appellants presented medical records that established the number of days for their family's hospital stay was 21 days instead of 11, as IRC had previously recorded. As a result, IRC recalculated its proposed final distribution. It proposed to keep the amount distributed to Bifitw Kadir and Recept Seran (for the death of their three-year old daughter in the attack) the same, and adjusted the "roughly proportional distribution" to the remaining three families. The magistrate court then held a pretrial conference on September 15, 2020. On determining that no available "information placed the Feinberg method in doubt," the magistrate court decided to proceed according to the relief requested in IRC's petition. The magistrate court also noted that Appellants had not objected to IRC's petition, as was required. Subsequently, IRC discovered an additional $13,470.27 that had not been accounted for and again recalculated the final distribution. This last revision occurred on October 7, 2020, and was the final calculation and distribution plan

6

at issue in this case. On October 15, 2020, IRC filed its final updated petition for approval to commence a final distribution of the funds.

Following the filing of the last updated petition, the magistrate court held two evidentiary hearings: the first on November 2, 2020, and the second on November 23, 2020. In both hearings, the magistrate court reiterated that the only issue was whether the final distribution was reasonable and equitable. It "limit[ed] [the parties'] line of questioning to whether or not the method of distribution used by the trustee was the correct methodology." Thus, while Appellants could discuss their disagreement with how IRC's methodology had been employed, they were not permitted to put on the record the nature and extent of their injuries. The hearings primarily focused on the examination and cross-examination of Julianne Donnely-Tzul, the executive director of IRC's Boise Office, and the methodology IRC had applied to determine the final proposed distribution. Each side also submitted exhibits. In between these evidentiary hearings, Appellants filed their first objection to IRC's updated petition for the approval of final distribution of funds.

At the end of the evidentiary hearings, the magistrate court declined Appellants' request for additional briefing on their arguments, explaining that their pretrial memorandum was sufficient for consideration of their arguments. One month later, the magistrate court issued an order approving IRC's proposed final distribution of the Wylie Street Emergency Fund. The final distribution approved by the magistrate court outlined the amount to be paid out of the remaining funds to each family as follows:

| Recipient | Remainder to Be Paid | Total Paid Out From Trust |
|---|---|---|
| Bifitw Kadir & Recept Seran | $123,860.44 | $192,956.05 |
| Maida Jasim & Mustafa Mutlak | $49,450.21 | $134,967.54 + $110.46 to be paid by IRC |
| Ahmad & Asmaa Manla | $12,541.92 | $44,528.75 |
| Mustafa Mohammed & Ekhlas AI Khudhur | $16,927.79 | $55,922.80 |
| Ibado Hassan | $0 | $2,438.82 |
| Neema lkadukunda | $0 | $1,727.01 |
| General Items | $0 | $13,055.11 |
| **TOTAL** | **$202,780.36** | **$445,596.08** |

In approving this final distribution, the magistrate court concluded that IRC's use of "a finite number of days in the hospital [was] an equitable, reasonable and prudent method to calculate the pay-out of the trust." Further, as trustee, IRC had discretionary power to determine the best method for distribution of the trust's remaining funds, including adjustments for "resulting differences in valuation." (Citing I.C. § 68-106(c)(23)). In rejecting Appellants' objections, the magistrate court expressed concern that Appellants were "asking [it] to determine that their family's loss is greater than the other families' losses based upon a subjective view of their injuries." The magistrate court reiterated that attempting to establish such a record was improper since it was undisputed that all the affected families suffered horrendous losses. Further, the only issue before the magistrate court was whether IRC had acted as a reasonable and equitably prudent person would in calculating the distribution of funds by using the number of days each family spent in the hospital. The magistrate court concluded that IRC's adoption of an objective methodology to disburse the funds ensured an "equitable and reasonable distribution of the trust."

Appellants appealed to the district court, alleging that the magistrate court erred because there was no trust. In the alternative, Appellants argued that the application of Feinberg's methodology was outside IRC's discretion and a breach of its fiduciary duties. In short, Appellants explained that they "believe[] the monies given to the families were not intended to be the corpus of a trust, but were instead intended to be a gift." Appellants also argued that the magistrate court erred by not allowing them to present evidence concerning the nature of their families' injuries and future medical needs. Sitting in its appellate capacity, the district court affirmed the magistrate court's judgment and order approving IRC's final distribution of funds. The district court first determined that Appellants' due process rights had not been violated by the magistrate court's decision to prohibit presenting arguments or evidence of the nature of their families' injuries. The district court noted that Appellants had been given adequate notice and an opportunity to be heard and argue their position through both their pretrial memoranda and at the evidentiary hearings in which Appellants could question IRC's witnesses. Further, the district court concluded that Appellants had failed to object to IRC's petitions to distribute the funds, which they were required to do. Appellants' first objection on the record did not occur until after the first evidentiary hearing before the magistrate court.

Next, the district court concluded that there was substantial and competent evidence to support the magistrate court's conclusion that IRC had established a trust. Likewise, the district court upheld the magistrate court's determination that IRC's distribution methods were supported by substantial and competent evidence inasmuch as IRC "follow[ed] the attempts of an expert to structure payments to people who have suffered in disasters using objective standards to determine the allocations." The district court also concluded that IRC held broad discretion in exercising its best judgment as a trustee and held "no duty to distribute a specific amount of funds to specific victims." Further, the district court determined that there had been "no evidence of improper partiality, dishonesty, or bad faith by the IRC." On the final issue of the magistrate court's refusal to hold an evidentiary hearing in which Appellants could attempt to show that their injuries were greater than the other beneficiaries, the district court determined that the magistrate court's decision was within its bounds of discretion. Therefore, it affirmed the magistrate court's order. Appellants timely appealed to this Court.

## II. STANDARD OF REVIEW

When reviewing the decision of a district court acting in its appellate capacity, this Court "reviews the trial court (magistrate) record to determine whether there is substantial and competent evidence to support the magistrate's findings of fact and whether the magistrate's conclusions of law follow from those findings." *Matter of Est. of Hirning*, 167 Idaho 669, 675, 475 P.3d 1191, 1197 (2020) (quoting *Pelayo v. Pelayo*, 154 Idaho 855, 858-59, 303 P.3d 214, 217-18 (2013)). "If the district court affirmed the magistrate court's decision, and the magistrate court's findings are supported by substantial and competent evidence, this Court affirms the district court as a matter of procedure." *Id.* Importantly, "this Court does not review the decision of the magistrate court." Rather, it is "procedurally bound to affirm or reverse the decisions of the district court." *Id.*

Additional standards of review will be addressed in turn.

## III. ANALYSIS

Appellants argue that the charitable donations to IRC for the Wylie Street Emergency Fund "were not intended to be the corpus of a trust, but were instead intended to be gifts." They argue that the distinction between a gift and a trust is key because "this entire action does not involve a trust and thus should never have been in probate court." Alternatively, Appellants argue that even if a trust were properly formed, IRC breached its fiduciary duties as trustee. IRC responds that as a charitable organization receiving donations, it "is a public trust" with the discretion to distribute

9

funds "according to the charitable purpose of the organization." Further, it asserts that it "had discretion to choose the recipients of the funds regardless of whether those funds were placed into a separate trust" or were treated as gifts. Respondents and beneficiaries Maida Jasim and Mustafa Mutlak also submitted a brief in support of IRC's arguments, adding that public policy favors predictable guidance for volunteers and charitable organizations acting as a trustee of funds collected to help victims after tragedies.

In making these arguments, the parties discuss three key issues: (A) whether a trust was formed; (B) if a trust was formed, whether IRC acted reasonably in allocating the final distributions; and (C) whether the magistrate court abused its discretion or denied Appellants due process in limiting their evidence at the hearings. Upon reviewing the briefing and arguments of the parties, we conclude that the district court's decision, affirming the magistrate court's decision, should be affirmed.

**A. The district court properly affirmed the magistrate court's conclusion that IRC formed a trust based on the substantial and competent evidence in the record.**

Appellants contend that "an express trust could not have formed between IRC and the gracious individuals who donated monies for the Wylie Street attack victims." They maintain that the donated funds were intended to be a gift. Appellants cite California law to establish five requisite elements for the creation of an express trust, each of which they argue was unmet here. IRC responds that its website, letters, and communications with the donors "evidence a trust agreement between IRC and the donors" to the Wylie Street Emergency Fund. Moreover, IRC asserts that the funds were held in trust " 'to help the refugee families who were hurt by the attack at [the Wylie Street] apartment complex in Boise, Idaho,' and also to 'support [IRC's] work in Boise as [it] provide[s] counseling and other services to the refugee community shaken by this incident.' " IRC also reiterates that the district court's analysis that, as a 501(c)(3) charitable organization, IRC holds its funds in trust and has "discretion to distribute the funds according to the charitable purposes of the organization."

Under Idaho law, "[a] settlor creates an express trust by manifesting an intention to create a trust." *Camp Easton Forever, Inc. v. Inland Nw. Council Boy Scouts of Am.*, 156 Idaho 893, 901, 332 P.3d 805, 813 (2014). *See also* Restatement (Second) of Trusts § 348 (1959) ("A charitable trust is created only if the settlor manifests an intention to create such a trust."). This intent "requires no particular words or conduct; the settlor simply must evidence his intention, upon

10

transferring the property, or res, to the trustee, that the trustee will hold the res for the benefit of a third person, the beneficiary." *Camp Easton Forever*, 156 Idaho at 901, 332 P.3d at 813 (quoting *Garner v. Andreasen*, 96 Idaho 306, 308, 527 P.2d 1264, 1266 (1974)). The essential characteristic of a trust "is holding the legal and beneficial interests separately in a fiduciary relationship." *Id.* "Thus, no particular words are needed to create a trust, as long as the words show clear intent to transfer legal title to the trustee to hold the beneficial interest for a third person." *Id.* In other words, "an express trust in personalty[1] may be created where a person has or accepts personal property with the express or implied understanding that it is not to be his own, but that it is to be applied for certain specified purposes for the benefit of certain specified persons." *Kite v. Eckley*, 48 Idaho 454, 282 P. 868, 870 (1929).

Appellants base their argument on the five-element test for an express trust set forth in a California case, *Keitel v. Heubel*, 126 Cal.Rptr.2d 763, 773 (Cal. App. 2002). However, Idaho's courts have followed our own path in establishing the requirements of a trust: the settlor must manifest an intent to create a trust, and "[t]here must be certainty . . . as to the property to be subjected to the trust, the identity of the beneficiaries, and the manner in which the trust fund is to be administered and used." *Est. of Hull v. Williams*, 126 Idaho 437, 443, 885 P.2d 1153, 1159 (Ct. App. 1994) (citing *Bliss v. Bliss*, 20 Idaho 467, 476, 476, 119 P. 451, 454 (1911)). We agree with the district court that each of these trust characteristics was established here. Likewise, there was a clear intent to create a separate trust. The district court did not err in concluding that these legal conclusions logically and reasonably flow from the magistrate court's findings of fact.

Here, as found by the magistrate court, IRC's website informed potential donors that their charitable contributions would be used to "help the refugee families who were hurt by the attack at an apartment complex in Boise, Idaho." The funds would specifically be used to provide those "families" "with the critical support" they need, as well as to "provide counseling and other services to the refugee community shaken by this incident." Letters of gratitude sent to the charitable donors further explained that the funds were used by IRC in "help[ing] to pay for temporary housing, providing travel logistics, [and] helping to pay for the emergency airlift for victims needing out-of-state medical care." The funds would "continue to cover medical bills, and

---

[1] "Personalty" is "[p]ersonal property as distinguished from real property." *Personalty*, BLACK'S LAW DICTIONARY (11th ed. 2019). It may include tangible movables, such as cash, as well as intangible rights such as bank deposits, commercial paper, or corporate shares. *See Personalty*, GARNER'S DICTIONARY OF LEGAL USAGE (3d ed. 2011).

provide counseling to the refugee community as the needs arise." IRC informed the donors that these funds would help with "needs far into the future, as families grieve and recover." As articulated in their emails, IRC summarized that the donations were to "be used for services to the victims and their families who were physically injured or killed, and depending on need, the refugee community impacted by the attack."

As donations were received by IRC, they were assigned a specific code designating them as contributions specifically for the Wylie Street Emergency Fund—thereby creating a separate charitable fund from IRC's other charitable work. For the first three months following the Wylie Street stabbing, IRC assigned all its general fund donations to the Wylie Street Emergency Fund under the assumption that the general donations to IRC were intended to benefit victims of the attack. When IRC reviewed medical bills and receipts, or considered specific fund requests made by the victims and refugee community, the record indicates that IRC continuously evaluated whether expenses fell into the scope communicated to donors during the fundraising campaign. As requests for immediate needs slowed, IRC then considered a final distribution plan to issue the remaining funds to the four families who had suffered physical injury or death in the Wylie Street attack. We conclude that substantial and competent evidence supported these findings.

Importantly, when IRC later filed a registration of trust with the magistrate court, Appellants did not object despite having received notice of the trust registration, petition, and subsequent revisions. Their first and only objection to IRC's final and updated petition came *after* the magistrate court conducted an evidentiary hearing to determine whether the proposed distributions were reasonable and equitable.

Altogether, the communications and conduct between IRC and its charitable donors indicate the intent to form a trust. The donors made contributions to IRC specifically to benefit the victims of the Wylie Street attack. None of the funds were used for IRC's benefit, not even for overhead or administration costs when funds came in for IRC's general use. IRC acted as the settlor and defined the scope of the funds' use, informing donors before and after they made contributions on how the money would be administered. The specific property subjected to the trust consisted of the charitable donations made to the Wylie Street Emergency Fund. Specific individuals were not named in IRC's communications; however, a specific and restricted class of people—the Wylie Street attack victims and their refugee community—were identified as the sole beneficiaries of the donations. Thus, there was "certainty . . . as to the property to be subjected to

12

the trust, the identity of the beneficiaries, and the manner in which the trust fund is to be administered and used." *Est. of Hull*, 126 Idaho at 443, 885 P.2d at 1159.

We do not agree with Appellants' contention that the language in IRC's website and communications are evidence that the donations were to be a "gift" to be given directly to the families in equal portions. Appellants have not provided any legal analysis or cited any authority to support their gift argument; instead, they point only to IRC's use of the words "gift" and "contribution" in its letters and website to argue that the donors intended to make a gift. While this "gift" language is present in IRC's letters and website, the communications as a whole demonstrate that IRC collected charitable funds *to hold for the benefit* of specific third parties—*i.e.*, the victims of the Wylie Street stabbing. This is the hallmark of a trust. After all, a person can make a "*gift* of legal title to property to someone who will act as *trustee* for the benefit of a beneficiary." *Gift*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added). The use of the term "gift" by IRC does not automatically convert a trust into an inter-vivos gift under Idaho's common law, nor does it outweigh the balance of circumstances demonstrating an intent to form a trust.

Appellants also contend that the magistrate court failed to set out its reasoning for finding a trust. While we agree that the magistrate court could have discussed the requirements of trust formation more fully in its opinion, substantial and competent evidence still supports its conclusion that there was intent to create a separate trust to which charitable donors transferred money to IRC to hold for the beneficial interest of the victims—particularly the four families who suffered death and physical injury. *See Camp Easton Forever, Inc.*, 156 Idaho at 901, 332 P.3d at 813. As the district court held, this legal conclusion logically flows from the magistrate court's findings of fact, which were supported by substantial and competent evidence. Accordingly, the district court correctly affirmed the magistrate court's determination that a separate trust was established.

**B. The district court properly affirmed the magistrate court's conclusion that IRC reasonably exercised its discretion as a trustee in allocating the final distribution of the Wylie Street Emergency Fund based on the substantial and competent evidence in the record.**

Appellants argue that "[a]ssuming a trust was actually created, it was a breach of IRC's fiduciary duty to use [the Feinberg] method – which was really not a method meant to be used for the situation at hand." In other words, Appellants argue that Feinberg's method applies to mass casualty events—not the Wylie Street stabbing—and that courts cannot "even know what method Mr. Feinstein [sic] would have employed had he been consulted on this case." They add that "IRC

13

admittedly [did] not follow the Feinstein [sic] method articulated in the two articles it introduced as evidence, [and] it did not even distribute the funds in accordance with its own representations to the donors." IRC responds that "substantial [and] competent evidence supports the magistrate court's decision that IRC acted reasonably by allocating final distributions according to the objective measure of days spent in the hospital." We agree with IRC.

Ultimately, Appellants' argument here has missed the forest for the trees. They contend that the "Feinberg method" was not strictly applied here, nor should it have been, as if there is a specific formula crafted by Feinberg for all distribution cases. That is not the case. IRC admittedly utilized Feinberg's *methodology* and *principles* in developing its own objective formula for the Wylie Street Emergency Fund distributions; however, it explained that it adopted this objective approach to avoid undertaking a subjective analysis and comparison of the various injuries following this horrendous attack. Feinberg's work—as evidenced by articles in the record—has been applied to fund distribution following numerous events, including the tragedies of September 11, 2001, the 2007 Virginia-Tech shooting, and the 2010 BP oil spill. Simply put, Feinberg's approach is not a methodology restricted to mass casualty events, nor is it an exact formula or matrix applied universally to such cases. IRC's formula was its own creation. While inspired by Feinberg, it was not crafted by him.

The record supports the lower courts' findings that IRC, having learned of Feinberg's work, wanted to fashion a similar objective standard to ensure that the four refugee families would each receive an equitable distribution of funds. It did so by creating a formula that "prioritize[d] and award[ed] a fixed amount per death" and then scaled the remaining funds based on the number of days of hospitalization as an indicator of the severity of injuries. The disbursement weight afforded injuries was also calculated with "rough proportionality" "because strict proportionality would reduce the disbursement to the families with lesser injuries to almost nothing, due to the fact that one individual's hospital stay was much longer than the others." As articulated by the district court: "It is clear that there is no specific Feinberg method that can be taken from a text or paper and applied specifically to this case. The so-called Feinberg method follows the attempts of an expert to structure payments to people who have suffered in disasters using objective standards to determine the allocations." Thus, the question here was not whether IRC properly applied Feinberg's formula, but whether IRC performed its fiduciary obligations reasonably and with prudence.

14

"From time of creation of the trust until final distribution of the assets of the trust, a trustee has the power to perform, without court authorization, every act which a prudent man would perform for the purposes of the trust including but not limited to the powers specified" under Idaho Code section 68-106(c). I.C. § 68-106(a). This includes the trustee's power "to effect distribution of property and money in divided or undivided interests and to adjust resulting differences in valuation." I.C. § 68-106(c)(23). While courts will not permit an abuse of discretion by the trustee, they "will not interfere with a trustee's exercise of discretionary power when that exercise is reasonable and based on a proper interpretation of a trust's terms." *Ferguson v. Ferguson*, 167 Idaho 495, 500, 473 P.3d 363, 368 (2020) (citing Restatement (Third) of Trusts § 50 cmt. b (2003)).

The basic fiduciary duties relevant to analyzing an abuse of a trustee's discretion include "(i) the general duty to act, reasonably informed, with impartiality among the various beneficiaries and interests and (ii) the duty to provide the beneficiaries with information concerning the trust and its administration." *Id.* A trustee must also "act honestly and avoid acting in bad faith for a purpose other than to accomplish the purposes of the discretionary power." *Id.* In short, while trustees hold wide discretionary authority, "that discretion does not absolve a trustee of all basic fiduciary duties." *Id.*

Here, the magistrate court found that "[t]he purpose of the trust was to provide support to the families whose family member(s) were injured by the attack as well as to provide counseling and other services to the refugee community shaken by the attack." IRC made partial distributions to meet victims' immediate needs for approximately two years before determining that a final distribution of the trust's property should be effected. To avoid subjective valuations of the injuries suffered by each of the four families, IRC leadership proposed, researched, and authorized an objective standard that awarded a set amount per death in the family, and then scaled the remaining funds based on the number of days a family spent in the hospital. Admittedly, this formula was not strictly adhered to as the valuations would have resulted in an inequitable distribution where one family spent far more time in the hospital than the others. IRC compensated for this with a "rough proportionality" approach to create a more equitable distribution, likely to better meet each family's immediate and future needs.

We agree with both lower courts that IRC created a reasonable and objective formula for final distribution, and prudently exercised its discretionary authority "to effect distribution of property and money in divided or undivided interests and to adjust resulting differences in

15

valuation." I.C. § 68-106(c)(23). By applying an objective formula, IRC not only avoided the risk of partiality and inequity through a subjective valuation of the varying injuries, but also removed the need for a traumatic reliving of the incident by the affected families as they were forced to detail the horrors of the assault in order to receive their proper share.

Contrary to the caustic narrative that has been advanced by Appellants, the record demonstrates that IRC has continuously attempted to achieve a fair and objective distribution of the generous donations to help all the victims of a horrific tragedy. There is no doubt that Appellants suffered severe injuries and trauma from the Wylie Street attack, as have the other families. There is also no doubt that they will have continuing needs. But there is nothing in the donations, IRC's letters, the website, or other evidence from the record to show an intent by the donors—or a duty assumed by IRC—to distribute a definite amount of the fund to any specific individuals or families. Nothing indicates that IRC failed to comply with its final distribution formula or the purposes of the trust. Likewise, nothing has been shown to demonstrate any bad faith, partiality, or dishonesty from IRC in making its final distribution of the Wylie Street Emergency Fund.

Accordingly, we uphold the district court's affirmance of the magistrate court. The magistrate court's conclusion that IRC "acted in a reasonable, equitable and prudent manner when determining the final distributions" of the Wylie Street Emergency Fund is supported by substantial and competent evidence.

## C. The district court properly determined that the magistrate court did not abuse its discretion by confining the scope of the evidentiary hearing to the relief sought by IRC's petition.

Appellants argue that the magistrate court erred by not allowing them to present evidence of their past and future needs—medical and otherwise—as a result of the attack. They argue "it is impossible to make a determination of whether any methodology of distributing the funds is sufficient without understanding what the needs are of the victims – or intended recipients of the donated monies." Likewise, they contend that "interested parties should be allowed the opportunity to be heard before a judgment is rendered that significantly affects their rights." While they have not expressly claimed a due process violation, both Respondents and the district court addressed the issue as such. IRC argues that the district court correctly determined that Appellants received due process through notice and opportunities to be heard. IRC also argues that there was no abuse of discretion in limiting Appellants' evidence at the hearing to the reasonableness of IRC's

distribution method. Thus, we will address both (1) the due process concerns and (2) whether the magistrate court abused its discretion in limiting Appellants' evidence.

1. *Due Process was met.*

"Due process issues are generally questions of law," over which this Court exercises free review. *Neighbors for Healthy Gold Fork v. Valley Cnty.*, 145 Idaho 121, 127, 176 P.3d 126. 132 (2007). "The Fourteenth Amendment to the United States Constitution secures both substantive and procedural due process rights." *Bradbury v. Idaho Jud. Council*, 136 Idaho 63, 70, 28 P.3d 1006, 1013 (2001). Procedural due process focuses "on determining whether the procedure employed is fair and relates 'to the minimal requirements of notice and a hearing if the deprivation of a significant life, liberty, or property interest may occur.' " *Id.* at 72, 28 P.3d at 1015. "Due process is not a rigid doctrine; rather, it calls for such procedural protections as are warranted by a particular situation." *Telford v. Nye*, 154 Idaho 606, 611, 301 P.3d 264, 269 (2013). Because a person must not be arbitrarily deprived of his or her rights, "[t]he opportunity to be heard must occur at a meaningful time and in a meaningful manner." *Id.*

Here, Appellants received notice and participated in the proceedings surrounding IRC's registration of the trust and its petition for a final distribution of the Wylie Street Emergency Fund. The petition was updated multiple times without objection. Indeed, Appellants did not file an objection to the updated petition until *after* the first evidentiary hearing. Prior to this, they only filed a pretrial memorandum to contest the formation of a trust and argue that the funds were a gift meant to be delivered directly to the four families injured in the Wylie Street attack. The magistrate court considered these arguments and filings from Appellants before rendering its decision. In the pretrial conference, the magistrate court also informed the parties that it would not consider evidence in the upcoming hearings beyond the relief set forth in the petition. Appellants were then able to present evidence on the issue, make objections, and conduct cross-examination of witnesses. In short, Appellants participated fully in the proceedings and were afforded both notice and an opportunity to be heard, including making arguments in their briefing. These proceedings did not deny them due process.

2. *There was no abuse of discretion by the magistrate court in limiting the evidence at the hearing to the issue raised in the pleadings.*

Appellants argue that the magistrate court erred in limiting the scope of the evidence at the hearings and that "it is impossible to make a determination of whether any methodology of

17

distributing the funds is sufficient without understanding what the needs are of the victims – or intended recipients of the donated monies." IRC responds that "the only relevant question at the hearing was whether IRC reasonably exercised its discretion in distributing the Fund," and that "the district court correctly held that the magistrate court did not abuse its discretion by limiting the [Appellants'] evidence at the hearing to that which related to the reasonableness of IRC's chosen methodology." The district court concluded that the magistrate court's determination to not allow evidence of injuries and future medical needs was within the bounds of its discretion. Under the circumstances presented here, we agree that there was no abuse of discretion.

"This Court reviews challenges to a trial court's evidentiary rulings under the abuse of discretion standard." *Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 54, 995 P.2d 816, 824 (2000). "Likewise, a trial court's limitation on the scope of cross-examination is reviewed under an abuse of discretion standard." *Burgess v. Salmon River Canal Co.*, 127 Idaho 565, 574, 903 P.2d 730, 739 (1995). "Error is disregarded unless the ruling is a manifest abuse of the trial court's discretion and affects a substantial right of the party." *Perry*, 134 Idaho at 51, 995 P.2d at 821. When reviewing for an abuse of discretion, this Court determines whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

Here, the evidentiary hearings were conducted to determine whether IRC's distribution method was reasonable. The parties were told in advance that this was the only issue for consideration, particularly since there had been no objection filed to any of IRC's updated petitions seeking approval for final distribution of the Wylie Street Emergency Fund. However, Appellants misperceived what they needed to do to win their case. These two evidentiary hearings were not scheduled to consider the nature and extent of the parties' injuries or to determine the subjective monetary valuation of those injuries. The hearings were set to consider whether IRC implemented a reasonable method for final distribution and, if so, whether IRC's application of that method was flawed. Appellants failed to address either question below. In attempting to demonstrate that IRC failed to account for Appellants' future needs, or adequately compensate all the victims, Appellants repeatedly tried to maneuver around the question of methodology to create a weighing and balancing of the victims' respective injuries. Furthermore, Appellants had a full opportunity to

submit exhibits, raise objections where needed, call witnesses, and conduct cross-examination of Donnely-Tzul, the executive director of IRC's Boise Office.

After considering the totality of the record, we conclude that the district court properly determined that the magistrate court did not abuse its discretion by confining the scope of the evidentiary hearing to the relief sought by IRC's petition. The trial court correctly perceived the issue as one of discretion, acted within the bounds of its discretion, acted consistently with the applicable legal standards, and reached its decision by the exercise of reason. Accordingly, we affirm the district court in upholding the magistrate court's order approving the final distribution of funds.

## IV. CONCLUSION

For the foregoing reasons, we hold that the district court correctly affirmed the magistrate court's order approving the final disbursement plan of the Wylie Street Emergency Fund. Substantial and competent evidence supports the magistrate court's findings of fact and the magistrate court's conclusions of law followed from those findings. Therefore, we affirm the district court as a matter of procedure. Costs are awarded to IRC as a matter of right, pursuant to Idaho Appellate Rule 40(a).

Chief Justice BEVAN, Justices BRODY, STEGNER and ZAHN **CONCUR.**

19